**MFS INTERNATIONAL, INC., Plaintiff,**

v.

**INTERNATIONAL TELCOM LTD., Defendant.**

**Civil Action No. 98–1753–A.**

United States District Court, E.D. Virginia.

May 24, 1999.

Joseph S. Luchini, Hazel and Thomas, Falls Church, Virginia, for plaintiff.

Robert C. Gill, Slavit and Gill, Washington, DC, for defendant.

**MEMORANDUM OPINION**

ELLIS, District Judge.

This telecommunications services dispute presents the following questions:

(1) Does the two-year statute of limitations in § 415(b) of the Federal Communications Act (FCA) [1] apply to state law

---

1. 47 U.S.C. §§ 151 *et seq.*

causes of action?

(2) Can parties, by contract, agree to a limitations period shorter than the two-year period prescribed in § 415(b)?

(3) Does a claim for failure to pay a recurring monthly charge for telecommunications services arise when each monthly invoice becomes due and payable rather than at the conclusion or termination of the service contract?

For the reasons stated below, all three questions must be answered in the affirmative.

**I.**

On May 24, 1995, International Telcom d/b/a Kallback Direct ("Telcom"), a Delaware corporation with its principal place of business in Washington, entered into a Master Service Agreement (the "Agreement") with MFS International ("MFS"), a Delaware-incorporated telecommunications carrier doing business in Virginia. This Agreement provided for MFS to supply Telcom with various foreign telecommunications services in return for agreed-upon compensation. The particular services to be provided were to be specified in service orders issued by MFS at Telcom's request. The Agreement further stated that the parties' complete agreement consisted of (i) the Agreement, (ii) the service orders issued and accepted pursuant to the Agreement, and (iii) MFS's applicable published tariffs.

Service order #1BL–01022, issued on May 3, 1995, stated that MFS agreed to provide Telcom with telecommunications services between New York and London consisting of a "384K clear channel circuit," which included a "local loop" in New York and a "local loop" in London (the "circuit"). Telcom agreed to pay a fee of

$12,875 per month plus costs for these services for a stated term of one year.[2] According to MFS's calculations, this one-year period began on November 1, 1995, when services to Telcom commenced, and indeed the invoices do not indicate that any services were provided prior to this date.[3]

Pursuant to the Agreement, Telcom was billed monthly, in advance of the provision of services. Each invoice, consistent with the MFS tariff,[4] provided that payment was due 30 days after its date of issuance. The record reflects that Telcom paid some, but not all of the invoices issued under the May 3 service order. Specifically, Telcom did not pay the invoices dated December 15, 1995; March 19, 1996; April 2, 1996; May 2, 1996; August 5, 1996; and October 7, 1996. These invoices were not paid, Telcom alleges, because MFS failed to provide services during the periods associated with the invoices. It further appears that despite Telcom's failure to pay these invoices, MFS assessed no extra charges or late fees on the unpaid invoices, although it was entitled to do so under the terms of its tariff. Nor did MFS discontinue service to Telcom in 1995 or 1996, although the tariff empowered it to do so without liability and, at the same time, to "declare all future monthly and other charges which would have been payable by the Customer during the remainder of the term for which services would have otherwise been provided to the Customer to be immediately due and payable." MFS International Tariff, ¶ 3.7.4.

Telcom further claims that between November 1996 and April 1997, the circuit experienced repeated line interruptions and was unable to carry telecommunications traffic on a continuous basis. Even

---

**2.** This provision was in accordance with MFS's tariff, which provided that the parties could enter into written service orders that defined "the duration of services." MFS International Tariff, ¶ 3.1.3(B).

**3.** Upon expiration of the one-year term of the service order, MFS continued to provide service to Telcom on a month-to-month basis

under the previously agreed upon terms, as it was authorized to do by its tariff. *See* MFS International Tariff, ¶ 3.1.3(C).

**4.** MFS's tariff provides that "[r]ecurring charges shall be due and payable within 30 days after the date of the invoice." MFS International Tariff, ¶ 3.7.2(B).

so, Telcom made prompt monthly payments during this period, paying MFS a total of $77,250 at the monthly rate of $12,875. Telcom now alleges that because the circuit was only intermittently functional, MFS was entitled to only a portion of the billed amount, namely $30,900. In this regard, Telcom sent a note to MFS by facsimile on November 14, 1996, stating that "the circuit has been down again since September" and requesting that MFS call to discuss credits for the account. Thereafter, by letter dated January 20, 1998, Telcom requested a refund of $43,650, based on the alleged circuit interruptions that occurred between November 1996 and April 1997. MFS has refused this refund request. All MFS services to Telcom were discontinued on August 24, 1997, apparently based on both Telcom's failure to pay the outstanding 1995 and 1996 invoices and Telcom's desire to end the relationship because of the alleged service interruptions.

MFS's complaint in this removed action[5] seeks breach of contract damages against Telcom in the amount of $125,-472.42 based on the latter's failure to pay the 1995 and 1996 invoices issued pursuant to the May 1995 service order. Telcom's four count counterclaim seeks a $43,650 refund from MFS, stemming from the circuit service interruptions that allegedly occurred during the November 1996 to April 1997 time period. The four counts against MFS allege (i) violation of 47 U.S.C. § 201(a); (ii) violation of 47 U.S.C. § 201(b); (iii) breach of contract; and (iv) conversion. Before the Court are Tel-

com's motion for partial summary judgment on the basis that much of MFS's claim is time-barred and MFS's motion to dismiss Telcom's counterclaim on the basis that it, too, is time-barred and, in addition, fails to state a claim for which relief can be granted.

## II.

MFS asserts that all of Telcom's claims must be dismissed because they were not brought within the time required by the Master Service Agreement. Paragraph 11.2 of the Agreement states

> No action or proceeding against MFS International shall be commenced more than one year after the service(s) is rendered, and the parties acknowledge that this clause 11.2 constitutes an express waiver of any rights under any other otherwise applicable longer statute of limitations.

This provision, MFS argues, bars the claims asserted in the counterclaim, given that the services complained of in the counterclaim were rendered from November 1996 to April 1997, more than a year before this action was filed. Telcom concedes that the contractual provision, on its face, appears to bar the counterclaim, but contends that the contract provision is void as against public policy, given the FCA two-year statute of limitations. The FCA provides that "all complaints against carriers for the recovery of damages not based on overcharges shall be filed with the Commission within two years from the time the cause of action accrues, and not after." 47 U.S.C. § 415(b).[6] This provi-

**5.** The circuitous procedural history of this action is worth recounting. It commenced initially when MFS filed a diversity suit in this Court against Telcom on the basis of Telcom's failure to pay the 1995 and 1996 invoices. Soon thereafter, the matter was dismissed without prejudice at MFS's instance, apparently because MFS had concluded that the parties were not of diverse citizenship. Predictably, MFS then filed a state action against Telcom in Fairfax County Circuit Court based on the same unpaid invoices, which action Telcom promptly removed on the basis of federal question jurisdiction. Following its *sua sponte* inquiry and request for briefing,

this Court confirmed the presence of federal question jurisdiction. *See MFS Int'l, Inc. v. International Telcom Ltd.,* Order, C.A. No. 98-1753-A (April 9, 1999); *MCI Telecommunications Corp. v. Garden State Inv. Corp.,* 981 F.2d 385, 387 (8th Cir.1992) ("Although a user's refusal to pay charges fixed by a tariff will often arise in the context of a broken contract, the carrier's claim for payment is necessarily based on the filed [federal] tariff.").

**6.** Although the terms of this provision speak only to complaints filed with the FCC, courts have uniformly interpreted it to apply to ac-

sion, Telcom contends, reflects a public policy allowing a two-year window in which to bring claims against carriers and rendering parties powerless to avoid or contradict this federal policy by contract. Thus, Telcom's argument presents two questions: (1) does the FCA two-year limitations period in § 415(b) apply to the two putative state law counterclaims-breach of contract and conversion-as well as to Telcom's federal claims and (2) does the existence of § 415(b) trump the parties' contractual limitations period by rendering it void as against public policy?

### 1. Does § 415(b) apply to state law claims?

■ Telcom's breach of contract and conversion claims purport to rest on state law and hence, on their face, do not implicate the FCA, including § 415(b). Yet, existing authority teaches otherwise, establishing that such putative state law claims are in fact governed by the federal statute of limitations set out in § 415(b). *See, e.g., Hofler v. American Tel. and Tel. Co.*, 328 F.Supp. 893, 894 (E.D.Va.1971); *Ward v. Northern Ohio Tel. Co.*, 251 F.Supp. 606, 611 (N.D.Ohio 1966), *aff'd*, 381 F.2d 16 (6th Cir.1967). One sensible principle underlying these cases is the recognition that applying state statutes of limitation to such claims against communications carriers "would defeat the national uniformity Congress intended in enacting the [two-year] statute of limitations." *Swarthout v. Michigan Bell Tel. Co.*, 504 F.2d 748, 748 (6th Cir.1974). Indeed, further support for this result comes from the plain language of § 415(b), which is not limited to claims brought under the FCA; this broad language instead reaches "all complaints against carriers for the recov-

ery of damages not based on overcharges," [7] and such "complaints" plainly encompass Telcom's breach of contract and conversion claims.

■ More fundamentally, the state law claims themselves will be preempted if, on close scrutiny, they are revealed to be actions based on the MFS tariff masquerading as state law claims. Section 203(c) of the FCA makes clear that it is unlawful for a carrier to "extend to any person any privileges or facilities in such communication, or employ or enforce any classifications, regulations, or practices affecting such charges, except as specified" in the tariffs that carriers are required to file with the Federal Communications Commission. 47 U.S.C. § 203(c). Accordingly, a carrier will not be held to a contract to provide services or rates that conflict with the applicable tariff. *See generally American Tel. and Tel. Co. v. Central Office Tel.*, 524 U.S. 214, 118 S.Ct. 1956, 1962–63, 141 L.Ed.2d 222 (1998). The FCA's proscription against enforcement of any carrier's promise to provide services or rates in conflict with the tariff assures that where services and rates are concerned, "there is no space between the contract and the tariff . . . and so there is no room for a state law claim of breach of contract." [8] *Cahnmann v. Sprint Corp.*, 133 F.3d 484, 489 (7th Cir.1998), *cert. denied*, —— U.S. ——, 118 S.Ct. 2368, 141 L.Ed.2d 737 (1998). As a result, a suit to enforce a contract's provisions as to rates or services must in fact rely on the underlying tariff, which has the force of law. *See MCI Telecommunications Corp. v. Garden State Inv. Corp.*, 981 F.2d 385, 387 (8th Cir.1992). Such claims, if they survive at

tions filed in federal district court, as well. *See, e.g., Pavlak v. Church*, 727 F.2d 1425 (9th Cir.1984); *Ward v. Northern Ohio Tel. Co.*, 251 F.Supp. 606 (N.D.Ohio 1966), *aff'd*, 381 F.2d 16 (6th Cir.1967).

7. "Overcharges" are defined as "charges for services in excess of those applicable thereto under the schedules of charges lawfully on file with the Commission." 47 U.S.C. § 415(g). Telcom does not contend that the

counterclaim seeks recovery of overcharges and does not argue that the more generous limitation period for such actions, *see* 47 U.S.C. § 415(c), should apply.

8. Neither presented nor addressed here are those circumstances in which customers might bring contract or tort claims against telecommunications carriers that do not implicate a tariff and so sound in state law.

all,[9] arise under the FCA, which requires that carriers collect and customers pay all lawful charges the tariff prescribes,[10] and so are necessarily subject to the requirements of § 415(b). In sum, then, § 415(b), and not the state limitations period, applies to Telcom's two putative state law counterclaims. Given this, no part of Telcom's counterclaim is time-barred if § 415(b) prevents the parties from contracting for a shorter limitations period.

2. *Can the parties agree to a shorter limitations period than § 415(b) provides?*

■ It has long been well-settled that parties may agree to a limitations period shorter than that provided by state law. *See, e.g., Missouri, K & T R Co. v. Harriman Bros.*, 227 U.S. 657, 672, 33 S.Ct. 397, 57 L.Ed. 690 (1913). This holding reflects the general principle that the parties' freedom of contract should be given effect absent clear policy considerations to the contrary. The *Harriman Brothers* holding also follows from the policy underlying statutes of limitations, namely to "encourage promptness in the bringing of actions, [so] that the parties shall not suffer by loss of evidence from death or disappearance of witnesses, destruction of documents, or failure of memory." *Id.* at 672, 33 S.Ct. 397. In other words, statutes of limitations are not created to ensure that parties have sufficient time to bring their claims, but rather to require plaintiffs to bring suit promptly. They do not open a window to suit, but instead close a door, beyond which no claim can be maintained. As a result, "there is nothing in the policy or object of such statutes which forbids the parties to an agreement to provide a shorter period, provided the time is not unreasonably short," since such a provision in no way conflicts with the policy underlying statutes of limitations. *Id.*

Consistent with this rationale, the Fourth Circuit has adhered to the principle that parties may contract for shorter limitations periods, noting that "it is well settled that such a provision, if reasonable in extent, is within the power of the parties and is binding upon them, even if the stipulated period is shorter than set up in the statutes of limitation otherwise applicable." *Atlantic Coast Line Ry. Co. v. Pope*, 119 F.2d 39, 44 (4th Cir.1941). The Supreme Court of Virginia has also invariably honored such provisions in the absence of a statute explicitly disallowing them. *See, e.g., Massie v. Blue Cross and Blue Shield*, 256 Va. 161, 500 S.E.2d 509, 511 (1998); *Smith & Marsh v. Northern Neck Mut. Fire Ass'n*, 112 Va. 192, 70 S.E. 482, 482 (1911).

Telcom does not dispute the holdings of these cases, but argues that they apply only where the parties' agreed-upon limitations period is shorter than the applicable state statute of limitations provides. According to Telcom, however, the analysis changes when a *federal* statute of limitations is at issue. Telcom's primary support for this proposition is *Taylor v. Western & Southern Life Ins. Co.*, 966 F.2d 1188 (7th Cir.1992). There, plaintiffs' 42 U.S.C. § 1981 race discrimination action against their employer was barred by the six-months limitation of actions clause in their employment contracts. The Seventh Circuit acknowledged that under applicable state law and "general federal policy," parties to a contract could agree to a limitations period shorter than that provided by statute, as long as the shorter period was not inconsistent with public policy. *Id.* at 1204. Accordingly, "[b]ecause Congress did not provide an express statute of limitations applicable to this cause of action," the court reasoned, "allowing the parties to contract for a shorter limitations

---

9. Given the ultimate resolution of the limitations issue, it is not necessary to determine whether in the face of preemption it is proper to dismiss such putative state law claims or to allow them to proceed recast as federal claims.

10. *Cf. Thurston Motor Lines v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 534, 103 S.Ct. 1343, 75 L.Ed.2d 260 (1983) (applying parallel provision of Interstate Commerce Act).

period than that which would be borrowed from state law is not contrary to public policy, assuming the contracted for limitations period is reasonable." *Id.* at 1205. Telcom argues, in effect, that this conclusion necessarily establishes its logical converse, namely that when Congress *does* set an express statute of limitations, as it has in the FCA, parties may not enforce a contract for a shorter limitations period as such a contract would be contrary to public policy.

■ Telcom's logic is flawed; nothing in *Taylor* logically requires such a result. Instead, the inference *Taylor* invites is more likely the significantly narrower, sensible notion that parties may not shorten a Congressionally-enacted limitations period that precludes shortening either explicitly or by clear implication. This conclusion sensibly does not implicate federal statutes of limitations, for such statutes neither explicitly nor implicitly embody a prohibition or policy against private agreements shortening the limitations period. Absent such a prohibition or policy, there is no reason to conclude that private agreements shortening a federal limitations period violate public policy.

Telcom's reading of *Taylor* is also flawed as it suggests that state and federal statutes of limitations must be treated differently in this regard, the former allowing private agreements to shorten the statutory period and the latter always prohibiting such agreements. Significantly, with a single exception, no court has adopted Telcom's argument;[11] no court has held that the analysis as to the validity of a contractual limitations provision depends on whether it purports to shorten a state rather than a federal statute of limitations.

Indeed, there is no principled reason for distinguishing between the two, as both state and federal statutes of limitations advance identical public policies. Were a provision shortening the relevant period to violate the latter, it must logically violate the former as well.

*Order of United Commercial Travelers of America v. Wolfe,* 331 U.S. 586, 67 S.Ct. 1355, 91 L.Ed. 1687 (1947), a decision cited in *Taylor* (and relied on by Telcom), suggests that the proper inference to be drawn from *Taylor* is that parties may, by contract, shorten a state or federal limitations period provided the state or federal statute establishing such a period does not, explicitly or by clear implication, prohibit such shortening. Thus, in *Wolfe,* the Supreme Court stated,

> It is well established that, in the absence of a *controlling statute to the contrary,* a provision in a contract may validly limit ... the time for bringing an action on such contract to a period less than that prescribed in the general statute of limitations.

*Id.* at 589, 67 S.Ct. 1355 (emphasis added). A "controlling statute to the contrary" cannot mean, as Telcom argues, any federal statute of limitations, for *Wolfe* does not distinguish between state and federal statutes. And clearly, because a typical state statute of limitations[12] cannot be a "controlling statute to the contrary,"[13] neither can a typical federal statute of limitations. A "controlling statute to the contrary" must sensibly be understood to mean a federal or state statute that explicitly proscribes such contractual limitations. An example of such a statute is Va.Code § 38.2–314, which states that "[n]o provi-

---

11. In one instance, a federal court has accepted this logic and concluded that a federal statute of limitations prevents parties from contracting for a shorter limitations period. Relying on *Taylor, Madero v. Refco,* 934 F.Supp. 282, 284 (N.D.Ill.1996), holds that a plaintiff cannot be held to his agreement to observe a shorter limitations period for claims brought under the Commodity Exchange Act than that provided in the statute.

12. By which is meant, a statute of limitations that does not explicitly or by clear implication prohibit shortening of the limitations period.

13. Were a typical state statute of limitations a "controlling statute to the contrary," the general rule that permits reasonable shortening of a limitations period would be rendered meaningless and left utterly without practical effect.

sion of any insurance policy shall be valid if it limits the time within which an action may be brought to less than one year after the loss occurs or the cause of action accrues." Thus, consistent with *Wolfe* and *Taylor,* any insurance policy provision purporting to limit the time for bringing actions to a period less than one year would be invalid in Virginia. Unlike the Virginia statute, which is directed to ensuring that claimants have sufficient time to bring their claims, typical statutes of limitation are meant " 'to encourage promptitude in the prosecution of remedies.' " *Wolfe,* 331 U.S. at 608 n. 20, 67 S.Ct. 1355 (quoting *Riddlesbarger v. Hartford Ins. Co.,* 74 U.S. (Wall) 386, 390, 19 L.Ed. 257 (1868)). Thus, an agreement further shortening the limitations period is completely consistent with the policy underlying a typical state or federal statute of limitations, provided that a reasonable period for bringing the claim is permitted. The time permitted under Telcom's contract—one year—is clearly reasonable.

In summary, there is no justification for disallowing the relevant contractual provision simply because an explicit federal statute of limitations exists when that statute does not prohibit such shortening, either explicitly or by clear implication. Accordingly, Telcom's claims are time-barred, as they were brought more than a year after the relevant services were rendered by MFS.[14] In light of this disposition, there is no need to consider whether

Telcom's counterclaim states a claim for which relief can be granted.

## III.

The statute of limitations is also the gravamen of Telcom's partial summary judgment motion. Specifically, Telcom contends that MFS's claims regarding Telcom's 1995 and 1996 unpaid invoices are time-barred, with the exception of those claims arising out of the October 7, 1996, invoice for $12,875. Again, two questions are presented: (1) which statute of limitations controls MFS's claims and (2) when did the MFS claims accrue and the statute of limitations begin to run?

### 1. What is the appropriate statute of limitations?

▇ MFS suggests that Virginia's five-year statute of limitations for breach of contract claims applies to its action against Telcom. But like Telcom's "state law" counterclaims, MFS's claims against Telcom are governed by federal law. Again, this is because the FCA, which forbids carriers from offering nontariff services, and the judicially created filed-rate doctrine, which renders any carrier's promise to depart from the tariff terms unenforceable, operate in combination to assure that "there is no space between the contract and the tariff . . . and so there is no room for a state law claim of breach of contract." *Cahnmann,* 133 F.3d at 489. As a result,

---

**14.** Alternatively, even were the counterclaims not time-barred under ¶ 11.3 of the Agreement, the terms of the tariff would prevent Telcom from prosecuting the claims. Paragraph 3.1.4(G) of MFS's filed tariff, effective February 22, 1996, states:

> Any claim of whatever nature against the Company shall be deemed conclusively to have been waived unless presented in writing to the Company within thirty (30) days after the occurrence that gave rise to the action.

As noted above, a filed tariff has the force of law. The only relevant written contact that Telcom had with MFS between November 1996 and May 1997 was the November 14, 1996, facsimile that stated that the circuit had been down since September and (read gener-

ously) requested that Telcom's account be credited appropriately. Even if the November facsimile is understood to "present a claim" to MFS regarding circuit failures in the first half of November 1996, this is not sufficient to preserve Telcom's claims based upon faulty service in the months that followed. Between November and April, Telcom regularly and promptly paid for services rendered by MFS, without written protest. The November complaint, without more in the next six months, cannot be characterized as presenting a "claim" to MFS regarding interruptions and deficiencies in service experienced between November 1996 and April 1997. Thus, by failing to comply with the tariff, Telcom has waived the right to present the instant counterclaims.

a carrier's action for payment is necessarily based on the underlying tariff rather than on any contract or understanding with the purchaser of services.[15] *See Thurston Motor Lines v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 535, 103. S.Ct. 1343, 75 L.Ed.2d 260 (1983) (applying parallel provision of Interstate Commerce Act). Federal tariffs are not mere contracts, but have the force of law. *See Garden State Inv. Corp.*, 981 F.2d at 387. Thus, while "a user's refusal to pay charges fixed by a tariff will often arise in the context of a broken contract, the carrier's claim for payment is necessarily based on the filed tariff," *id.*, and even more precisely, on the FCA's requirement that carriers collect and customers pay the charges authorized by the tariff, *cf. Thurston Motor Lines*, 460 U.S. at 534, 103 S.Ct. 1343 (noting that the carrier's duty to collect and consignee's obligation to pay all lawful charges duly prescribed by the tariff grow out of and depend upon the Interstate Commerce Act). Accordingly, MFS's claims against Telcom arise under and are governed by the FCA, which provides a two-years statute of limitations for such actions. *See* 47 U.S.C. § 415(a).[16]

*2. When did MFS's cause of action accrue?*

■ The FCA requires that "[a]ll actions at law by carriers for recovery of their lawful charges, or any part thereof, shall be begun, within two years from the time the cause of action accrues, and not after." 47 U.S.C. § 415(a). The crucial question, then, is when MFS's cause of action against Telcom first accrued. Telcom contends that a new cause of action accrued as each invoice became due and payable so that when MFS brought the instant action on October 15, 1998, the two-year statute of limitations had already expired on the December 1995, March 1996, April 1996, May 1996, and August 1996 invoices. MFS counters that its cause of action did not accrue until the final invoice issued pursuant to the May 1995 one-year service order became due and payable. While the services were billed for on a monthly basis, MFS argues that the May 1995 service order represents a single contract for services and therefore that the statute of limitations did not begin to run until final performance of the contract was due and Telcom's breach became unmistakable. According to MFS, since service under the one-year service order began on November 1, 1995, the statute of limitations on actions against Telcom for payment pursuant to the service order should not begin to run until the invoice for services provided through October 31, 1996, became due and payable, on November 6, 1996. As explained below, MFS's argument fails.

■ The general rule is that a cause of action accrues when a plaintiff knows or has reason to know of the harm or injury that is the basis of the cause of action. *See, e.g., Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180 (4th Cir.1999); *Cox v. Stanton*, 529 F.2d 47, 50 (4th Cir.1975). As the most apposite reported case reflects, this general rule also applies in the context of § 415(a) of the FCA.

In *MCI Telecommunications Corp. v. Teleconcepts, Inc.*, 71 F.3d 1086 (3d Cir. 1995), a telecommunications carrier issued monthly invoices for long distance charges to an owner of coin-operated pay phones, which the pay phone owner repeatedly failed to pay. The Third Circuit, guided by the principle that a carrier's cause of action "accrues with discovery of the right or wrong or of the facts on which knowl-

---

**15.** Of course, contractual provisions not implicating the terms of the filed tariff (such as the one-year limitation of actions in this instance) or permitted by the tariff (such as the parties' agreement as to duration of services here) may be enforced. The precise boundary between such enforceable and unenforceable contractual provisions is neither presented nor addressed here.

**16.** While § 415(b) applies to actions against carriers by customers, § 415(a) applies to actions by carriers for recovery of lawful charges.

edge is chargeable in law," concluded that since the carrier's tariff stated that "amounts not paid within 30 days of the invoice will be considered past due," the carrier's cause of action necessarily accrued 30 days after issuance of a given monthly invoice, at which moment § 415(a)'s "two year clock started ticking." *Id.* at 1100–01. The court analogized the customer's duty to make monthly payments to the carrier to an obligation to make installment payments, noting that in the latter type of contract, a separate cause of action arises on the date each payment is missed and the statute of limitations thus runs against each installment from the time that it becomes due. *See id.* The similarities between the problem considered in *MCI Telecommunications* and the situation at hand are too obvious to require enumeration; the result reached there should obtain here for the same reasons.

Yet, MFS disputes the application of *MCI Telecommunications*, on the ground that nothing in that case indicates that the parties had submitted to an agreement binding them for a particular term, as opposed to a month-to-month arrangement. Thus, MFS argues, each invoice in *MCI Telecommunications* represented a separate contract between the parties, while in the instant case, there is only a single contract between MFS and Telcom for a year of services at the agreed-upon monthly rate. It is this single contract that MFS claims is sued on here in light of Telcom's ultimate breach of this contract in November 1996. This purported distinction, even assuming it is factually correct,[17] is unpersuasive; in both *MCI Telecommunications* and the case at bar, the customer was billed for services through monthly invoices, and in both cases, payment was clearly due, under the terms of the tariff and on the face of the invoices, thirty days after the issuance of the invoice, rather than at the conclusion of any service contract term.

Moreover, MFS's case support for its proposed distinction between the instant action and *MCI Telecommunications* is inapposite. MFS relies, for instance, on *South Central Bell v. Allnet Communications*, 1992 WL 31848, 1992 U.S.Dist. LEXIS 1670 (E.D.La.1992), an unpublished district court case in which a telecommunications carrier assessed an underutilization charge against a customer based on underutilization of a given circuit over a five-year liability period. In that case, the statute of limitations was held to begin to run when the five-year liability period concluded, and plaintiff, who brought suit less than two years after conclusion of this period, was permitted to go forward in its action for charges. *South Central Bell,* however, is clearly not applicable to these facts, since in that case, the plaintiff's cause of action was not apparent and did not arise until the conclusion of the five-year period, when it was first billed for underutilization charges.

MFS also cites *Columbia Heights Section 3, Inc. v. Griffith–Consumers Co.*, 205 Va. 43, 135 S.E.2d 116 (1964), a case involving an open account agreement in which plaintiff provided defendant fuel oil, parts, and services, submitting periodic statements of account. Defendant there made payments on this account from time to time in amounts that bore no relation to the charges or existing balance on any particular statement. The Supreme Court of Virginia held that the statute of limitations began to run from the time the account was due, which it defined as the time defendant terminated the contract and plaintiff received a final bill payable on receipt. *See id.* at 47, 135 S.E.2d at 118–119. The opinion notes that the parties' course of conduct revealed an intention that payment in full should not become due until the contract terminated. *See id.*

*Columbia Heights* is easily distinguishable. Initially, the mode of payment in *Columbia Heights* differs from the present

---

17. Nothing in the *MCI Telecommunications* opinion discloses whether the services were

provided on a month-to-month basis or pursuant to a contract for a stated term.

situation. There, defendant made occasional payments in round figures (e.g., $1000) that bore no relation to the particular amounts submitted in the statement of account, suggesting that payments were to be applied to his balance as a whole, rather than to particular items or services; by contrast, in the case at bar, Telcom treated each invoice separately, paying the monthly amount either in full or not at all, suggesting that it understood each invoice to establish a separate, severable debt. Even more importantly, it is not clear from the *Columbia Heights* opinion whether the previous statements of account submitted during the term of the open account agreement were marked payable upon receipt. Again, the instant case is significantly different; here both the invoices themselves and the tariff clearly state that invoices are due and payable within 30 days of the date of issuance. In the absence of any compelling reason to do otherwise, "[w]e must give these words their ordinary meaning." *MCI Telecommunications Corp.*, 71 F.3d at 1100.[18] No such reason appears here, and action for payment on each invoice therefore accrued 30 days after the invoice issued.[19]

Supporting this conclusion is the fact that MFS's tariff provided that MFS could discontinue service to Telcom and require payment for the remainder of the term upon Telcom's nonpayment of any monthly charge. While MFS relies upon this provision to argue that the parties contemplated a contract for the entire term, the provision actually undermines this contention. It makes clear that Telcom was bound to make timely monthly payments in the amount set out by the service order and that MFS was free to consider failure to pay a breach of the parties' contract and discontinue service accordingly. While MFS did not exercise its option to discontinue service and demand full payment upon Telcom's failure to pay, this does not render the parties' agreement and the tariff governing that agreement ambiguous.

Taken together, the tariff, the Agreement, and the invoices make clear that Telcom was obligated to pay each invoice 30 days after its issuance and that any single failure to do so was thereafter actionable. It is clear that if MFS wished, it could have brought suit against Telcom when Telcom failed to pay its first invoice within 30 days from the date of issuance. Thus, MFS's cause of action had plainly accrued by that date as to this portion of the parties' contract. Under the terms of § 415(a), the statute of limitations must begin to run at that moment. Any other conclusion "would allow a claimant to trigger the statute of limitations upon presentation of a claim rather than having the existence of a claim trigger the statute of limitations." *Metromedia Co. v. Hartz Mountain Assocs.*, 139 N.J. 532, 655 A.2d 1379, 1381 (1995).

Because the cause of action on each invoice accrued when that invoice became due and payable, only MFS's action as to the October 1996 invoice may be maintained, and partial summary judgment as to the remainder of MFS's claims should be entered for Telcom.

## IV.

Since the Agreement bars Telcom's counterclaim and, alternatively, because Telcom failed to give timely notice of its claims as required by MFS's tariff, MFS's motion to dismiss Telcom's counterclaims

---

**18.** *See also Country Club of Portsmouth v. Wilkins*, 166 Va. 325, 328, 186 S.E. 23, 24 (1936) (holding that when a note states that it shall become immediately due and payable upon the happening of a specified contingency, the court is powerless to construe the note as becoming due and payable only upon the election of the holder).

**19.** The conclusion that the plain language must control is strengthened by the fact that the parties are powerless to assent to or contract for any terms contradicting those set out in the tariff; thus, even if Telcom and MFS through mutual consent treated the invoices as anything other than due and payable within 30 days of issuance, they could not by these actions vary the unambiguous terms of the tariff.

must be granted. In addition, since MFS's claims are time-barred under the applicable statute of limitations except for its claim as to the October 1996 invoice, partial summary judgment must be entered for Telcom. An appropriate order has entered.