*746 OPINION OF THE COURT
Bernard J. Fried, J.
Plaintiff World-Link, Inc. moves for partial summary judgment (CPLR 3212) as to liability in connection with the provision of telecommunications services to defendant MeZUN.COM, Inc. (Mezun), based upon sections 201 and 202 of the federal Communications Act of 1934 (47 USC §§ 201, 202).
This motion raises the issue of the preemptive effect of these sections upon state law claims and defenses in light of recent amendments to the Communications Act, and the “detariffing” policy adopted by the Federal Communications Commission (FCC). This issue is one of first impression in the First Department, and there is a split of authority in the federal circuit courts.
World-Link is a telecommunications carrier, and it owns 100% of World-Link Telecom, Inc. (WLT), which provides telecommunications services to companies at wholesale charges.
Defendant Mezun is also a telecommunications carrier, focusing on a niche market comprising Turkish expatriates residing in the United States.
Mezun began its relationship with World-Link by acting as an agent for another entity wholly owned by World-Link, World-Link Solutions, Inc. (WLS), World-Link’s retail carrier. At this time, the parties developed a method of payment through a course of dealing, whereby World-Link established a merchant account in which it tracked the receipt of credit card payments made by WLS’s customers for services sold through Mezun. The credit card charges were directly deposited into this merchant account, and World-Link then paid Mezun a commission based upon its volume of sales.
Thereafter, World-Link alleges that it proposed that Mezun become a reseller of WLT’s services, and be charged wholesale rates. The parties entered into a carrier service agreement (agreement) in August of 2001 (exhibit A, annexed to affidavit of Paul Stamoulis at schedule C), and altered their payment arrangement accordingly.
According to World-Link, each month WLT issued Mezun an invoice that listed the credit card payments made by Mezun’s customers that were processed through WLT’s merchant account, in addition to indicating the wholesale charges incurred by Mezun for WLT’s services (affidavit of O. Deykina 1Í17). Allegedly, the parties agreed that, each month, the credit card is *747 suing banks of Mezun’s customers were to pay directly into WLT’s merchant account for the amounts charged by Mezun’s customers for its retail services, and WLT credited Mezun’s account with an amount equal to the payments received (id. 1Í1Í15-16). Because Mezun was charging its customers at retail prices while being billed at wholesale prices, the credit card payments made by Mezun’s customers were greater in amount than WLT’s payments, which resulted in a credit to Mezun’s account each month (id. 111118-19).
World-Link alleges that, beginning in November of 2001, and without advising World-Link, Mezun set up its own merchant account and began to directly receive its customers’ credit card payments (id. 1Í 21). Allegedly, due to a change in personnel in its accounting department, World-Link did not detect that WLT’s merchant account was not being credited for payments made by Mezun’s customers. Consequently, from November 16, 2001, when Mezun allegedly set up its own merchant account, until March 15, 2003, when the billing oversight was detected, World-Link continued to credit Mezun’s account for payments made by Mezun’s customers as if the payments were received by WLT and tracked to Mezun’s account. Mezun’s monthly invoices continued to show credits against WLT’s wholesale charges, while World-Link did not realize that WLT had not received any payments from Mezun for these services (id. KH 25-28).
Several days after World-Link discovered the billing error, it transmitted a letter to Mezun indicating that Mezun owed WLT $1,101,570.33 (exhibit K, annexed to affirmation of Michael Rowe, Esq.). A second letter followed, in which World-Link reiterated the outstanding balance. Additionally, World-Link demanded that Mezun begin sending weekly payments of $30,000 to pay off the balance due, and advised Mezun that WLT would start receiving payments from Mezun’s customers directly (exhibit C, annexed to affidavit of O. Deykina).
Mezun disputes many of World-Link’s allegations concerning the parties’ altered payment arrangement that followed the execution of the agreement. According to Mezun, when it became the wholeseller of WLT’s services, World-Link agreed to provide Mezun certain technology to allow Mezun’s customers to refill their calling cards on a real-time basis (affidavit of A. Hantal 1i 6). Mezun alleges that in order to facilitate this new arrangement, World-Link encouraged Mezun to create its own merchant *748 account to receive credit card payments directly from its customers (id. HH 7, 12).[1]
Mezun alleges that, due to technical problems arising out of the parties’ use of different technology to charge customers’ credit cards, it was unable to directly collect payments from its customers’ credit cards for some time, while World-Link continued to collect the payments from Mezun’s customers directly into WLT’s merchant account (id. 1110). Allegedly, after the establishment of its own merchant account, Mezun began collecting payments from customers who purchased services through Mezun’s Web site, but that World-Link still failed to provide Mezun with the necessary technology to enable customers to fill their calling cards on a real-time basis, and, consequently, World-Link continued to provide services to Mezun’s customers by refilling their calling cards or issuing new cards and collecting payments (id. 1110).
At the time that World-Link began sending Mezun invoices purportedly displaying the amount of income Mezun earned from its customers’ purchase of services, Mezun alleges that it repeatedly contacted World-Link to inquire about their accuracy (id. 1117). Representatives from World-Link assured Mezun that the invoices were accurate, and reflected the payments made by Mezun’s customers using World-Link’s system and other tax credits (id.). Mezun alleges that when the credit card payment systems of the two companies were eventually integrated, Mezun was finally able to directly refill its customers’ calling cards on a real-time basis without having to rely on World-Link’s system (id. 1119).
Mezun alleges that in August of 2002, it began receiving customer complaints regarding the quality of long distance telephone service, and consequently, began losing a tremendous amount of business. Subsequently, Mezun alleges that upon receiving notice in March of 2003 that it had an outstanding balance due to a billing error, World-Link began interfering with Mezun’s ability to wholesell services to its customers, by altering the system that allowed Mezun to receive payments from its customers for refilling their calling cards on a real-time basis. Accordingly, Mezun alleges that the payments for these *749 services went directly to WLT’s merchant account, and World-Link’s name began appearing on Mezun’s customers’ credit card statements, causing confusion and complaints amongst customers. Further, Mezun alleges that World-Link’s CEO sent a threatening letter to Mezun’s CEO, stating that if Mezun did not pay the outstanding balance, “your [Mezun’s] valuable Turkish American eyeballs will be swayed from Mezun and onto another portal. The dilution of your brand will be massive and permanent . . . Wednesday will be the start of our campaign and once it starts it will be irrevocable” (exhibit N, annexed to Rowe affidavit).
On May 25, 2003, Mezun informed World-Link that it was moving to another carrier. Thereafter, World-Link filed this action asserting two causes of action. The first cause of action is for services rendered. The second cause of action is for account stated. World-Link is seeking compensatory damages in the amount of $1,065,892.59.
In its answer, Mezun asserts 14 counterclaims against World-Link for breach of contract, negligent misrepresentation, fraud, violation of General Business Law § 349 (a), violation of 47 USC § 258, tortious interference with contract, tortious interference with prospective business advantage, negligent misrepresentation, fraud, breach of the implied covenant of good faith and fair dealing, detrimental reliance, unfair competition, prima facie tort, and violation of the Lanham Act (15 USC § 1125 [a] [1] [A], [B]).
World-Link moves for partial summary judgment (CPLR 3212) as to liability for services rendered, arguing that sections 201 and 202 of the Communications Act entitle it to judgment as a matter of law, and obligate Mezun to pay for charges, irrespective of whether the precise amount of charges owed is in dispute. According to World-Link, sections 201 and 202 of the Communications Act govern the interpretation of the agreement, preempt the application of New York law, and require telecommunications carriers to prevent unlawful discrimination, which occurs whenever a customer receives lower charges for services than other, similarly situated customers. World-Link contends that the application of New York law here, pursuant to the choice of law clause in the agreement and Mezun’s common-law defenses raised in opposition to this motion, would result in Mezun receiving lower charges for service than World-Link’s other customers, which impliedly conflicts with the congressional objective of ensuring that carriers charge nondiscrimi *750 natory and uniform rates. World-Link relies on the Supreme Court’s decision in American Telephone & Telegraph Co. v Central Office Telephone, Inc. (524 US 214 [1998], reh denied 524 US 972 [1998]), in addition to the Seventh Circuit’s decision in Boomer v AT & T Corp. (309 F3d 404 [7th Cir 2002]).
Mezun argues that this dispute is not preempted by the Communications Act, and maintains that disputed issues of fact remain as to whether it has an outstanding balance with World-Link. Further, Mezun contends that the court should deny summary judgment where, as here, World-Link failed to respond to discovery requests. Further, Mezun argues that irrespective of whether it owes World-Link an outstanding balance, World-Link waived the right to pursue this action for charges, based upon common-law doctrines of waiver, equitable estoppel, and the voluntary payment doctrine.
Additionally, Mezun maintains that World-Link’s action to recover charges is time-barred, based upon a provision of the agreement which states that if any billing dispute is “not resolved within 120 days of the date the dispute is submitted, the disputing party must initiate legal proceedings. If the disputing party does not initiate legal proceedings in accordance with this Agreement, then the disputing party waives its right to dispute the bill” (schedule C [d] [I], annexed to agreement). According to Mezun, World-Link did not comply with this provision.
In order to obtain summary judgment, the plaintiff must make a prima facie showing of entitlement to judgment as a matter of law, after which the burden shifts to the defendant to establish the existence of admissible evidence sufficient to raise a disputed issue of fact (Cohen Tauber Spievak & Wagner, LLP v Alnwick, 33 AD3d 562 [1st Dept 2006]).
The threshold question is whether sections 201 and 202 of the Communications Act govern the interpretation of the parties’ agreement and preempt the application of New York State law, including Mezun’s common-law defenses.
I. Preemption
A. Express Preemption
State law may be preempted through express statutory language, by implication, and when it actually conflicts with federal law (Balbuena v IDR Realty LLC, 6 NY3d 338, 356 [2006]). Section 201 (b) of the Communications Act provides that “[a]ll charges, practices, classifications, and regulations for *751 and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful.” Section 202 (a) states, “It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices ... or services for or in connection with like communication service, directly or indirectly ... or to make or give any undue or unreasonable preference or advantage to any particular person.”
The sections at issue do not contain any text expressing that Congress intended to explicitly preempt state law (see Balbuena, 6 NY3d at 356 [express preemption occurs where Congress explicitly declares that a federal law is intended to supercede state law]; see also Marcus v AT&T Corp., 138 F3d 46, 53 [2d Cir 1998] [Congress made no express statement that it intended to completely preempt state law in the area of long distance telecommunications]).
B. Implied Preemption
The issue then becomes whether sections 201 and 202 impliedly preempt the choice of law clause in the agreement calling for the application of New York law and Mezun’s common-law defenses. Implied preemption takes the form of either “field preemption” or “conflict preemption” (Balbuena, 6 NY3d at 356). Field preemption occurs when federal law so thoroughly occupies a legislative field “as to make reasonable the inference that Congress left nc room for the States to supplant it” (id.). Conflict preemption will be found where compliance with both federal and state regulations is an impossibility, or where the “state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress” (id.). Whether the sections at issue here preempt state law requires an exploration of congressional intent in the area of federal telecommunications law.
1. Filed Rate Doctrine
Historically, the nondiscrimination objective codified in sections 201 and 202 was enforced by section 203 of the Communications Act, which required all long distance telecommunications carriers to set forth their rates, and other terms and conditions of service in tariffs to be filed with the FCC (47 USC § 203 [a]). Section 203 prohibited carriers from offering their services at any rate or term that differed from the tariff filed with the FCC (47 USC § 203 [c]). In conjunction with this required filing and to advance the nondiscriminatory objective *752 behind sections 201 and 202 of the Act, courts developed the “filed rate doctrine,”[2] reaffirmed by the Supreme Court in American Telephone & Telegraph Co. v Central Office Telephone, Inc. (524 US 214 [1998], supra).
There, the Supreme Court articulated that the filed rate doctrine binds telecommunications carriers and customers to the rates and tariffs filed pursuant to section 203, and preempts any state law claim that directly or indirectly, either in the form of damages, restitution or otherwise, has the effect of imposing any rate for services other than that reflected in the filed tariff (id. at 223, 229). Thus, the rate filed by the carrier was to be enforced, irrespective of whether the carrier misrepresented rates to a customer, or if the customer was unaware of the carrier’s rates (id. at 223). The Court noted that although the rule is “undeniably strict and it obviously may work hardship in some cases ... it embodies the policy which has been adopted by Congress in the regulation of interstate commerce to prevent unjust discrimination,” which is violated “when similarly situated customers pay different rates for the same services” (id. at 222-223).
Therefore, in order to prevent this violation, the rates filed pursuant to section 203 preempted any state law claims that had the effect of varying a carrier’s rate from the rate filed with the FCC (id.; see also Marcus, 138 F3d at 56, 58-59 [common-law fraud claim seeking compensatory damages from carrier was preempted because permitting recovery would effectively allow the plaintiffs to receive a discounted rate for telephone service that varies from other customers, which violates the filed rate doctrine’s mandate of equal rates for equal service; a carrier’s filed rates “conclusively and exclusively enumerate the rights and liabilities of the contracting parties”]).
2. Detariffing
Prior to the Supreme Court’s decision in American Telephone & Telegraph Co. (supra), however, the FCC attempted to modify section 203 of the Communications Act in order to make rate filing by nondominant long distance carriers optional rather than required, in an attempt to deregulate the telecommunications industry (Matter of Tariff Filing Requirements for Interstate Common Carriers, 7 FCCR 8072 [1992], stay granted 7 *753 FCCR 7989 [1992]). The Supreme Court subsequently invalidated this order, finding that the FCC lacked the authority to exempt carriers from the rate-filing requirement of section 203 of the Communications Act, in what amounted to the “introduction of a whole new regime of regulation” (MCI Telecommunications Corp., 512 US at 234).
Thereafter, in 1996, with the passage of certain amendments to the Communications Act, Congress expressly granted the FCC the authority to forbear from enforcing the rate-filing requirement to telecommunications carriers, in the event the FCC determined that such filing was “not necessary to ensure that the charges ... in connection with that telecommunications carrier . . . are just and reasonable and are not unjustly or unreasonably discriminatory . . . [and] [i]f the Commission determines that such forbearance will promote competition” (47 USC § 160 [a] [1]; [b]).
Subsequently, the FCC issued a series of orders[3] eliminating the requirement that telecommunications carriers file their rates with the FCC, termed “detariffing” (Matter of Policy & Rules Concerning Interstate, Interexchange Marketplace, 11 FCCR 20730 [1996], stay denied 12 FCCR 647 [1997], reconsideration granted 12 FCCR 15014 [1997], order issued 15 FCCR 22321 [2000]), which came into effect on August 1, 2001. In lieu of filing tariffs, the FCC anticipated that carriers would issue “short, standard contracts that contain their basic rates, terms and conditions for service” (11 FCCR 20730, 20763 ¶ 56 [1996]).
According to the FCC, mandatory detariffing would “foster competition,” in part, by “eliminat[ing] the ability of carriers to invoke the ‘filed-rate’ doctrine . . . [and] serve the public interest by preserving reasonable commercial expectations and protecting consumers” (11 FCCR 20730, 20732 1i 3, 20762 1i 55 [1996]). Additionally, detariffing would permit customers to “pursue remedies under state consumer protection and contract laws” (11 FCCR 20730, 20751 1f 38 [1996]), in addition to claims based upon “contract formation and breach of contract ... as to issues regarding the legal relationship between the carrier and customer in a detariffed regime,” that were previously precluded by the filed rate doctrine (Matter of Policy & Rules Concerning Interstate, Interexchange Marketplace, 12 FCCR 15014, 15057 ¶ 77 [1997]).
*754 Detariffing did not alter or otherwise affect carriers’ obligations to prohibit discrimination and the charging of unreasonable rates, as codified in sections 201 and 202 of the Communications Act, however. The FCC stated that sections 201 and 202 of the Communications Act “ continue [ ] to govern determinations as to whether rates, terms, and conditions . . . are just and reasonable, and are not unjustly or unreasonably discriminatory” (12 FCCR 15014, 15057 ¶ 77). The FCC did not explicitly indicate whether detariffing signaled the demise of the requirement that all rates charged by a carrier be uniform, as was previously required under the old regime, albeit in tandem with the filing of rates (see e.g. MCI Telecommunications Corp., 512 US at 229; American Telephone & Telegraph Co., 524 US at 223 [“the policy of nondiscriminatory rates is violated when similarly situated customers pay different rates for the same services”]).
3. Uniformity in Rates
Courts subsequently confronted with state law claims asserted against telecommunications carriers have grappled with the extent of implied preemption in light of detariffing. Specifically, much debate has centered on whether enforcement of the nondiscrimination sections of the Communications Act requires strict uniformity in rates, or whether some variation in rates is now permitted, which issue lies at the heart of this motion.
In Boomer (309 F3d 404 [2002]), upon which World-Link relies, the plaintiff asserted claims against a long distance carrier under various consumer protection statutes based upon alleged overcharging, in addition to challenging a mandatory arbitration provision in the customer’s servifce contract on unconscionability grounds. In response to the preemption argument raised by the carrier, the plaintiff contended that following detariffing, federal law no longer preempts state law challenges to the validity of contractual provisions in service agreements. The court was unpersuaded, finding the plaintiffs state law claims impliedly preempted by sections 201 and 202 of the Communications Act, and reasoning that despite the elimination of the tariff filing requirement under section 203, Congress’ objective that rates be nondiscriminatory was still to be enforced by requiring uniformity in rates (id. at 418, 421; accord In re Universal Serv. Fund Tel. Billing Practices Litig., 300 F Supp 2d 1107, 1119, 1121 [D Kan 2003] [the requirement of strict uniformity in the charging of rates survived detariffing], mot denied 370 F Supp 2d 1135 [D Kan 2005]).
*755 The court concluded that invalidating the arbitration clause in the service agreement, as the plaintiff was seeking, could result in customers in different locales receiving varying terms of service, which conflicts with the federal objective of attaining nondiscrimination, pursuant to sections 201 and 202, by upholding uniform rates, terms and conditions of service (Boomer, 309 F3d at 421; accord In re Universal Serv. Fund Tel. Billing Practices Litig., 300 F Supp 2d, supra at 1120 [the result of permitting the application of individual states’ laws to a carrier’s service contract “would be that no uniform body of federal law would emerge to guide long distance carriers . . . the lack of uniformity in the laws of all fifty states will in fact ultimately impede the Congressional objective of uniformity”]; Dreamscape Design, Inc. v Affinity Network, Inc., 414 F3d 665, 670 [7th Cir 2005], cert denied 546 US —, 126 S Ct 828 [2005]).
In contrast to Boomer, however, in Ting v AT&T (319 F3d 1126 [9th Cir 2003], cert denied 540 US 811 [2003]), which also involved a customer’s challenge to a provision in a service agreement under various state consumer protection statutes, the court came to the opposite determination. The court held that by permitting the FCC to eliminate the filing requirement under section 203 of the Communications Act, Congress necessarily intended to eliminate the requirement of strict uniformity in rates, which was previously enforced by the filed rate doctrine (id. at 1139). The court concluded that following detariffing, the application of different states’ contract and consumer protection laws that resulted in variations of rates, terms and conditions of service violated sections 201 and 202 of the Communications Act only if those variations were found to be unjust and unreasonable, or resulted in discriminatory preferences (id. at 1140, 1143).
Contrary to Ting's holding, I am persuaded that the congressional objective of ensuring nondiscrimination and equality of rates, embodied in sections 201 and 202, is ineluctably linked with, and achieved by, enforcing uniformity of rates, terms and conditions of service contained in customer-carrier service agreements (see e.g. Western Union Telegraph Co. v Esteve Brothers & Co., 256 US 566, 571 [1921]; North Am. Phillips Corp. v Emery Air Frgt. Corp., 579 F2d 229, 232 [2d Cir 1978]; In re Universal Serv. Fund Tel. Billing Practices Litig., 300 F Supp 2d at 1119).
4. Field Preemption
Despite the split of authority concerning whether uniformity survived detariffing, all of the courts reviewing these claims *756 agree that federal law no longer completely preempts state law in the area of long distance telecommunications, insofar as claims of breach of contract are asserted that challenge the manner in which carriers implement or fail to adhere to their own rates, terms and conditions of service, claims involving contract formation, and other claims arising under state consumer protection statutes, and do not challenge the reasonableness of a carrier’s rates (see Boomer, 309 F3d at 424 [“following detariffing, there appears to be some role for state law,” including state law challenges to the validity of the contract formation process itself]; see also In re Universal Serv. Fund Tel. Billing Practices Litig., 300 F Supp 2d at 1120-1121, 1145; Marcus, 138 F3d at 54 [the Communications Act “does not manifest a clear Congressional intent to preempt state law actions prohibiting deceptive business practices, false advertisement, or common law fraud”]; Dreamscape Design, Inc., 414 F3d at 673 [“with the passage of the Telecommunications Act of 1996, it is clear that Congress envisioned some role for state law after detariffing, so federal law no longer completely preempts the entire field”]).
Demonstratively, state law plays some, albeit limited, role in the regulation of the telecommunications industry. Thus, federal law does not so thoroughly occupy the legislative field of the telecommunications industry as to constitute field preemption (Balbuena, 6 NY3d at 356).
5. Conflict Preemption
Having determined that the congressional objective of nondiscrimination and equality in rates, embodied in sections 201 and 202 of the Communications Act, is achieved by uniformity, the question is whether application of New York law to the agreement and Mezun’s common-law defenses of waiver, equitable estoppel and the voluntary payment doctrine, impliedly conflict with, and frustrate, the accomplishment and purpose of this objective.
The essence of Mezun’s common-law defenses of waiver and equitable estoppel is that World-Link waived its right to pursue outstanding charges from Mezun by its own conduct, including World-Link’s failure to discover the outstanding charges at an earlier time, its exclusive knowledge of the disputed charges, and repeated representations that Mezun did not owe charges, which induced detrimental reliance on Mezun’s part. The doctrine of equitable estoppel is imposed by law where the enforcement of a party’s rights would work an injustice upon the person *757 against whom enforcement is sought (Jean Maby H. v Joseph H., 246 AD2d 282, 285 [2d Dept 1998]). The doctrine of waiver constitutes the abandonment of a known right, and is a “tool of equity” (Madison Ave. Leasehold, LLC v Madison Bentley Assoc. LLC, 30 AD3d 1, 5 [1st Dept 2006]). Thus, Mezun’s defenses are premised on the notion that it would be unfair to permit World-Link to pursue its right to collect charges for telecommunications services provided to Mezun, based upon World-Link’s own conduct.
A finding that discharges Mezun from the rates, terms, and conditions of service set forth in the agreement necessarily grants Mezun preferential treatment, where World-Link’s other, similarly situated customers are still bound by the rates, terms, and conditions of service set forth in their respective agreements. Further, invalidating these obligations in the agreement undoubtedly conflicts with the congressional objective that nondiscrimination and equality in rates be achieved by enforcing uniformity in rates, terms and conditions of service, set forth in long distance service contracts (see Boomer, 309 F3d at 424 [“state law . . . cannot operate to invalidate the rates, terms or conditions of a long-distance service contract”]; accord Dream-scape Design, Inc., 414 F3d at 673).
Therefore, because entitling Mezun to receive different rates, terms, and conditions of service from World-Link’s other customers creates an obvious obstacle to the accomplishment of equality and uniformity of rates and terms of service, Mezun’s common-law defenses of waiver and equitable estoppel are preempted by sections 201 and 202 of the Communications Act.[4]
Moreover, based upon my conclusion that sections 201 and 202 of the Communications Act govern the interpretation of the parties’ agreement, the provision which provides that a party waives the right to pursue redress of a billing dispute if it fails to commence legal proceedings within 120 days of submitting the dispute to the other party (agreement, schedule C [d] [I]), is also preempted. Shortening the time period for which World-Link may maintain an action to recover charges conflicts with *758 the congressional objective in a uniform two-year (previously one-year) limitations period for carriers’ recovery of charges from customers (see 47 USC § 415 [a] [establishing a two-year statute of limitations for carriers’ recovery of charges from customers]; see also Swarthout v Michigan Bell Tel. Co., 504 F2d 748, 749 [6th Cir 1974]; accord Prostar v Massachi, 239 F3d 669, 676-677 [5th Cir 2001]). Application of the provision in the parties’ agreement would effectively entitle Mezun to a shorter limitations period than other customers, leading to widely varying limitations periods in actions by carriers to recover charges.
Further, since I have determined that World-Link’s action to recover for the alleged outstanding balance of charges is governed by the Communications Act, the two-year statute of limitations provided for in section 415 necessarily applies (MFS Intl., Inc. v International Telcom Ltd., 50 F Supp 2d 517 [ED Va 1999]; accord Indiana Bell Tel. Co. Inc. v Thrifty Call, Inc., 2004 WL 3059705, *4, 2004 US Dist LEXIS 26429, *10 [SD Ind 2004]; Cooperative Communications, Inc. v AT&T Corp., 867 F Supp 1511, 1519 [D Utah 1994]). Accordingly, World-Link’s action to recover charges for telecommunications services, filed in June of 2003, is timely.
Naevus Intl. v AT&T Corp. (283 AD2d 171 [1st Dept 2001]), relied on by Mezun, does not compel a different result. That case involved state law claims asserted against a provider of mobile wireless communications, and not a carrier of long distance telecommunications. Additionally, it dealt with completely different provisions of the Communications Act that expressly apply to mobile wireless communications (id. at 172; 47 USC § 332).
Furthermore, North County Communications Corp. v Verizon N.Y., Inc. (233 F Supp 2d 381 [ND NY 2002]), additionally relied upon by Mezun, is also distinguishable. There, the plaintiff, a local exchange carrier, brought a variety of state law claims against a dominant carrier, alleging that the dominant carrier was engaged in anticompetitive and monopolistic activities. The court rejected the argument that the plaintiff’s claims were preempted, because the plaintiffs claims alleging monopolistic activities under the Donnelly Act did not challenge any term of the interconnection agreement between the parties, but affected conduct outside the agreement (id. at 386). While the court considered preemption in the context of a motion for removal to federal district court, which is not an adjudication of the merits *759 of a claim (Stan Winston Creatures, Inc. v Toys “R” Us, Inc., 314 F Supp 2d 177, 182 [SD NY 2003]), a finding in the plaintiffs favor would not have affected the uniformity of its rates, terms or conditions of service under its agreement with the defendant. In contrast and as discussed above, a finding of waiver in Mezun’s favor would affect the uniformity of rates, terms and conditions of service under the agreement, a variation of the agreement which conflicts with the congressional objective of uniformity.
A carrier’s right to collect its charges from a customer, even when those charges may be in dispute between the parties, is well established (see Iowa Network Servs., Inc. v Qwest Corp., 385 F Supp 2d 850, 903 [SD Iowa 2005], affd 466 F3d 1091 [8th Cir 2006]; Matter of Tel-Central of Jejferson City, Mo., Inc. v United Tel. Co. of Mo., Inc., 4 FCCR 8338, 8339 ¶ 9 [1989], review denied 920 F2d 1039 [D DC 1990]). Because World-Link has made a prima facie showing that it provided telecommunications services to Mezun, and is entitled to the rates set forth in the parties’ agreement, the motion for partial summary judgment as to liability is granted. The remaining issue of resolving what, if any, charges for services are owed to World-Link, is properly referable to a referee.
Accordingly, it is ordered that the motion is granted to the extent of granting partial summary judgment as to liability to World-Link, Inc.; and it is further ordered that the issue of damages is referred to a special referee to hear and report with recommendations, except that, in the event of and upon the filing of a stipulation of the parties, as permitted by CPLR 4317, the special referee, or another person designated by the parties to serve as referee, shall determine the aforesaid issue.

. Mezun submits an e-mail from a World-Link employee to Mezun, and a letter from the president and CEO of World-Link, Paul Stamoulis, which purportedly establish that World-Link was aware that Mezun was creating its own merchant account to collect payments from Mezun’s own customers (exhibits J, K, annexed to affirmation of Michael Rowe, Esq.).

. Section 203 of the Communications Act was modeled after the filed rate provisions of the Interstate Commerce Act (MCI Telecommunications Corp. v American Telephone & Telegraph Co., 512 US 218, 234 [1994]).

. The FCC’s orders, including detariffing, are entitled to deference (MCI WorldCom, Inc. v Federal Communications Commn., 209 F3d 760, 764 [DC Cir 2000]; Chevron U.S.A. Inc. v Natural Resources Defense Council, Inc., 467 US 837 [1984], reh denied 468 US 1227 [1984]).

. Mezun’s defense of the voluntary payment doctrine is preempted for the same reason, insofar as Mezun argues that World-Link waived the right to “take hack benefits it voluntarily gave to Mezun,” by seeking to recover charges from Mezun that it allegedly mistakenly credited to it (Mezun mem of law at 33).
For the reasons discussed at length above, Mezun is bound by the rates, terms and conditions of service set forth in the agreement.