**Cheryl BADGETT, Plaintiff,**

v.

**FEDERAL EXPRESS CORPORATION, Defendant.**

**No. 1:04 CV 220.**

United States District Court, M.D. North Carolina.

April 7, 2005.

James Edward Hairston, Jr., Law Offices of Florence Bowens, Durham, NC, for Plaintiff.

Edward J. Efkeman, Karen V. McManus, Federal Express Corp., Memphis, TN, Jill Stricklin Cox, John J. Doyle, Jr., Constangy, Brooks & Smith, LLC, Winston–Salem, NC, for Defendant.

## MEMORANDUM OPINION and ORDER

OSTEEN, District Judge.

Plaintiff Cheryl Badgett, a resident of North Carolina, brings this federal question and diversity action against her former employer, Defendant Federal Express Corporation ("FedEx"), a Delaware corporation with its principal place of business in Tennessee. Plaintiff asserts retaliation based on race and sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, et seq., as amended; retaliation based on race in violation of Section 1981 of the Civil Rights Act of 1866 (" § 1981"), 42 U.S.C. § 1981; retaliation for and interference with the exercise of her rights under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601 et seq.; intentional infliction of emotional distress; and negligent infliction of emotional distress. This matter is now before the court on Defendant's Motion for Summary Judgment.

For the reasons set forth herein, Defendant's Motion for Summary Judgment will be GRANTED in part and DENIED in part.

## I. BACKGROUND

The following facts are presented in the light most favorable to Plaintiff.[1]

Plaintiff Cheryl Badgett, a black female, applied for employment with Defendant FedEx on July 21, 1992, in New York. In conjunction with her application, Plaintiff was presented an Employment Agreement ("Agreement") that contains 15 numbered paragraphs. Below the title, the Agreement instructs in bold and capitalized letters, "IMPORTANT—PLEASE READ

---

1. In considering the motion currently before it, the court must construe the facts in the light most favorable to the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); Randall v. United States, 30 F.3d 518, 522 (4th Cir.1994).

AND SIGN BELOW." (App. Supp. Def.'s Mot. Summ. J. Ex. 6.) Paragraph 15, located directly above the signature line, provides in part:

> To the extent the law allows an employee to bring legal action against Federal Express, I agree to bring that complaint within the time prescribed by law or 6 months from the date of the event forming the basis of my lawsuit, whichever expires first.

(*Id.*) Plaintiff read and signed the Agreement, acknowledging that she "thoroughly underst[ood] its content." (*Id.;* Badgett Dep. July 16, 2002, at 18–19.) Plaintiff was subsequently hired by FedEx in or around October 1992, and continued to work with FedEx in New York until she transferred to the Greensboro, North Carolina, FedEx station in August 1994. Plaintiff worked for FedEx as a senior customer service representative and later as a courier.

In October 2000, Plaintiff brought suit in this court against FedEx and several individual managers, alleging claims under Title VII and various state law causes of action ("Badgett I").[2] On March 8, 2002, Magistrate Judge Sharp recommended that FedEx be granted summary judgment on all of Plaintiff's claims, except for racially hostile work environment under Title VII. *See Badgett v. Federal Express Corp.,* No. 1:00–CV–1053 (M.D.N.C. March 8, 2002) (recommendations and order granting partial summary judgment). Trial was set for April 15, 2002.

By the middle of March 2002, stress from her job and the upcoming trial in Badgett I began to tax Plaintiff. Plaintiff was "run down," not sleeping more than an hour at night, and mentally and physically tired. (Badgett Dep. Sept. 27, 2004, at 74 ("Badgett Dep.").) In this condition, Plaintiff considered herself "dangerous" while driving a truck for FedEx because her exhaustion resulted in her "careening in and out off the road and . . . just kind of wanting to doze." (*Id.* at 89.) Plaintiff told Gregg Taylor, the personnel manager, about her condition and Taylor suggested that Plaintiff "put something in writing" about unpaid personal leave. (*Id.* at 96.)

On Wednesday, March 20, 2002, Plaintiff gave Barry Scales, Plaintiff's boss and local operations manager, a letter requesting an unpaid personal leave of absence beginning that day and continuing up to April 22. Plaintiff did not phrase her request in terms of a medical problem, but wrote:

> As I'm sure you're aware of, I have an upcoming court date that's approximately three weeks away. Because of the intense nature of this legal proceeding, with the company, it would be in the best interest of both myself, as well as FedEx, to grant this leave.
>
> . . . . .
>
> This requested time will allow me to gather myself, focus on the immediate future and ultimately return, after this time off, to the quality and level of performance that my records clearly indicate.

(Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. Ex. 6.) Scales referred the matter to Stan Tolliver, FedEx's compliance officer. (Scales Dep. at 36.)

By Monday, March 25, Plaintiff "still hadn't gotten any sleep." (Badgett Dep. at 94.) Plaintiff called Scales before her shift started and informed him about her sleeping problems and that she was using

---

**2.** In Badgett I, Plaintiff brought claims arising from her allegedly discriminatory and hostile work environment. The matter now before the court is the second lawsuit brought by Plaintiff against FedEx. This matter largely rests upon retaliation and is based on facts and legal theories that arose subsequent to the events covered by Badgett I.

a sick day. (*Id.*) That same day, FedEx denied Plaintiff's request for unpaid personal leave. By letter, Michael Saladino, the district managing director, informed Plaintiff:

I received your correspondence requesting a Personal Leave to prepare for you[r] upcoming court case. I must deny the leave based on those reasons. I will direct your manager to allow you time off for any court appearances that are necessary. Please submit a list of court dates for your manager's review. The station cannot absorb the number of hours that it would take to cover your shift for an entire month. The Personal Leave Policy permits discretion in the granting of leaves if there is no negative impact on the business. Unfortunately in this case additional overtime would result which the station cannot afford.

I have attached a copy of the Personal Leave Policy, P 1–55 for your reference along with a copy of your request.

(Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. Ex. 7.) Plaintiff called in sick each day for the remainder of the week of March 25.

On Monday, April 1, 2002, Plaintiff again called in sick to Scales. (Badgett Dep. at 100.) This time, because Plaintiff had exhausted the five days of paid sick leave available to her, Plaintiff told Scales that she wanted to take "family leave." (*Id.* at 101.) Scales was not familiar with the leave policy and referred her to Tolliver. (*Id.* at 102.) Plaintiff tried calling Tolliver on April 1, but she could not reach him and left messages on Tolliver's voice mail and with his receptionist. (*Id.* at 100.) Because Plaintiff could not reach Tolliver, she again called Scales and asked him for the FMLA certification form because she "needed [her] doctor to draft [a] letter so that it reflected the information on the certification." (*Id.* at 102, 109.) The only form Scales could provide Plaintiff was a sample FMLA certification form contained in FedEx's policy manual. (*Id.* at 110.) Scales faxed the two-page document to Plaintiff that day. (Scales Dep. at 58.) Tolliver never returned Plaintiff's call of April 1. (Badgett Dep. at 101.)

Sometime between March 20 and April 2, 2002, Plaintiff called James Wells Jr., M.D., and told him about her sleeping problems. Dr. Wells had seen Plaintiff in August 2000. (*Id.* at 92–97.) Dr. Wells' notes reflect Plaintiff was "[n]ot sleeping, not handling this well," wanted a medication prescription called in to "Village Pharmacy," and "wanted to see [him] for an appointment." (Wells Dep. at 21–22.) Dr. Wells prescribed Plaintiff Ambien, a sleeping aid, "because of the circumstances associated with the situation at work and the impending trial." (*Id.* at 33–34.) Dr. Wells scheduled an appointment with Plaintiff for April 12, 2002.

During her absence on "family leave," Plaintiff kept in regular contact with FedEx. Each day the week of April 1, 2002, Plaintiff called Scales, who continued to refer her to Tolliver. (Badgett Dep. at 101.) Plaintiff would then try to call Tolliver, without avail. (*Id.*) There is no evidence that Tolliver ever returned Plaintiff's calls.

On April 12, 2002, Plaintiff had her appointment with Dr. Wells. Dr. Wells remembers Plaintiff was "very anxious, under a lot of stress, and essentially was in a position of, [he] thought, such stress that work was not an option right then." (Wells Dep. at 13.) He thought "anticipation of the trial definitely made her situation—her emotional state more labile. . . . [and] she was a lot more depressed and anxious than she had been prior to that time." (*Id.* at 33.) Dr. Wells wrote three prescriptions for Plaintiff on April 12 to help her cope with her stress, anxiety, and sleeplessness, one of which was Celexa, an

anti-depressant. (*Id.* at 23, 25.) Dr. Wells also wrote and signed a letter that day addressed "To Whom It May Concern," stating in its entirety: "Ms. Cheryl Badgett is currently unable to work due to a medical condition." (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. Ex. 10.) Dr. Wells gave the letter to Plaintiff.

That same day, Plaintiff faxed the letter to Scales and Tolliver from her home. (Badgett Dep. at 119.) Plaintiff's copy of the letter reflects it was received by or transmitted from Plaintiff's fax machine, but FedEx denies it was received at that time. Scales does not deny he received the April 12, 2002, letter, but does not recall whether he received it on April 12. (Scales Dep. at 68.) William Topley, Scales' manager, does not recall ever seeing or discussing the letter. (Topley Dep. at 41.)

Plaintiff did not return to work prior to the beginning of trial in Badgett I. Jury selection began and was completed on Thursday, April 11, 2002. The trial began Monday, April 15, and at the close of Plaintiff's case on April 16, the court entered a verdict in favor of FedEx. *See Badgett v. Federal Express Corp.*, No. 1:00–CV–1053 (M.D.N.C. April 16, 2002) (minute entry granting FedEx's oral motion for directed verdict). Plaintiff did not return to work after the trial.

On Thursday, April 18, 2002, Plaintiff sent a fax to Dr. Wells attaching the two-page FMLA certification form. (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. Ex. 8; Wells Dep. at 30.) On the fax cover sheet, Plaintiff wrote:

> Dr. Wells, though I am on an unpaid leave, my company, Federal Express is requiring me to submit a Doctor's note regarding my time away from work. My manager, Barry Scales has informed me that unless I do so with urgency, a letter will be placed in my file upon my return to work. It must be dated from the third day I called in sick, that was the 27th of March, 2002. I also need these forms filled out at your earliest convenience. They will allow the unpaid leave not to be held against me under the "Family Leave Act."

(App. Supp. Def.'s Mot. Summ. J. Ex. 11.)

Plaintiff did not return to work on Monday, April 22, or Tuesday, April 23, 2002, as she was under subpoena to testify in an unrelated criminal trial. (Badgett Dep. at 70.) Scales knew Plaintiff was under subpoena in a criminal case those two days. (Scales Dep. at 50.) On April 23, still not having received the completed FMLA certification form from Plaintiff or her doctor, Scales terminated Plaintiff's employment by letter:

> This letter is sent to inform you of your immediate termination, effective April 23, 2002, for violation of Policy P 1–20 and Policy P 1–8. The specific reasons for the termination are outlined below. As you know, you requested a personal leave of absence without pay (PLOA) to prepare for a trial in which you were suing FEDEX. The PLOA was denied. You then represented that you were ill and the company paid you for 5 days of medical absence consistent with policy. You were told, in writing, medical substantiation was needed as provided by Policy P 1–8. It has now been more than 30 days and you have neither returned to work nor provided medical documentation. Moreover, you were not too incapacitated to attend the trial last week which ended on Tuesday, April 16, 2002. At that time you stated you would return to work Monday, April 22, 2002. You also committed last week to fax or hand deliver the medical documentation. FEDEX still has nothing but your word to support your medical absence. Your conduct is in violation of the policies

listed above and will no longer be tolerated. You have been given the benefit of doubt and ample opportunity to comply with policy.

I also need to inform you that it was brought to my attention last week that there is substantial evidence that you violated Policy P 2–5, (Acceptable Conduct Policy) during the course for [sic] your lawsuit. Had you provided suitable medical documentation it would have been necessary to address these issues prior to returning you to work.

(Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. Ex. 5.)

On Thursday, April 25, 2002, Dr. Wells completed the FMLA certification form on behalf of Plaintiff and faxed it to FedEx. (Wells Dep. at 16, 30.) The FMLA certification form reflects that Dr. Wells considered Plaintiff's condition of "[e]xtreme anxiety and depression with significant emotional liability" a "serious health condition." (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. Ex. 8.) Dr. Wells wrote Plaintiff's condition commenced on March 25, 2002, and "[s]he is currently unable to work and may not improve sufficiently for work for several weeks." (*Id.*) Dr. Wells suggested treatment on a monthly basis for six months, including "psychotherapy and psychotropic medication management." (*Id.*) Finally, the certification form reflects that Plaintiff was then unable to perform work of any kind. (*Id.*) There is no evidence Dr. Wells was aware of Plaintiff's termination on April 23, 2002, when he completed and transmitted the FMLA certification form. Dr. Wells continued to treat Plaintiff by medication and office visits after her termination. (Wells Dep. at 25; Compl. ¶ 17.)

After exhausting her internal and administrative remedies, Plaintiff filed suit in the Superior Court of the State of North Carolina, Caswell County, alleging claims under Title VII, § 1981, and the FMLA, and for intentional and negligent infliction of emotional distress. Defendants removed the suit to this court. Now before the court is Defendant's Motion for Summary Judgment.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when an examination of the pleadings, affidavits, and other proper discovery materials before the court demonstrates that there is no genuine issue of material fact, thus entitling the moving party to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The basic question in a summary judgment inquiry is whether the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Summary judgment should be granted unless a reasonable jury could return a verdict in favor of the nonmovant on the evidence presented. *McLean v. Patten Communities, Inc.,* 332 F.3d 714, 719 (4th Cir.2003) (citing *Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2509–10). A court "must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh the evidence." *Williams v. Staples, Inc.,* 372 F.3d 662, 667 (4th Cir.2004) (citing *Thompson v. Aluminum Co. of Am.,* 276 F.3d 651, 656 (4th Cir.2002)). Although the court must view the facts in the light most favorable to the nonmovant, *see Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513, "bare allegations unsupported by legally competent evidence do not give rise to a genuine dispute of material fact." *Solis v. Prince George's County,* 153 F.Supp.2d 793, 807 (D.Md.2001).

If the nonmoving party fails to make a sufficient showing to establish an essential element of its case, summary judgment is proper because a "complete failure of proof" on an essential element "renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552. While the court "must take special care when considering a motion for summary judgment in a discrimination case because motive is often the critical issue, summary judgment disposition remains appropriate if the plaintiff cannot prevail as a matter of law." *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 958–59 (4th Cir.1996) (citing *Ballinger v. North Carolina Agric. Extension Serv.*, 815 F.2d 1001, 1005 (4th Cir. 1987)).

## III. ANALYSIS

Plaintiff brings five causes of action. In Count I, she claims she was retaliated against on the basis of race and sex for availing herself of her federally protected Title VII rights. In Count II, she claims she was retaliated against on the basis of race in violation of § 1981.[3] In Count III, she claims retaliation for, and interference with, exercising her rights under the FMLA. In Counts IV and V, Plaintiff claims intentional infliction and negligent infliction of emotional distress, respectively, based upon FedEx's allegedly extreme and outrageous conduct toward her.

FedEx asserts three arguments in support of its motion for complete summary judgment. First, it argues Plaintiff's intentional infliction of emotional distress, negligent infliction of emotional distress, § 1981, and FMLA claims are time barred by the six-month limitations clause contained in Plaintiff's Employment Agreement. Second, it contends Plaintiff cannot prevail on her Title VII and § 1981 claims because, even if she can establish a prima facie case of retaliatory discharge, she cannot show FedEx's proffered reasons for termination were a pretext for discrimination. Third, FedEx asserts Plaintiff cannot establish essential elements of her emotional distress claims.

### A. The Six–Month Contractual Limitations Clause

FedEx argues that Plaintiff's emotional distress, § 1981, and FMLA claims are time barred because Plaintiff's Employment Agreement contained a six-month limitations clause for any claims brought against FedEx, and Plaintiff did not file suit until nearly 22 months after her termination. (Def.'s Mem. Supp. Mot. Summ. J. at 6–8.) FedEx argues the clause should be enforced because North Carolina and federal law recognize contractual limitations clauses and the clause is reasonable under the circumstances. (*Id.* at 7.) Plaintiff argues against enforcement because none of the contractual limitations upheld by North Carolina courts have been six months or less. (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. at 9–11.) Plaintiff also argues that the six-month contractual limitations clause is unconscionable or unreasonable under the circumstances and would require her to sue on her emotional

---

**3.** Plaintiff's § 1981 claim is based upon facts not outlined above. Plaintiff alleges that during November 2000, she came into contact with human blood while handling a hazardous FedEx package. (Compl.¶ 9.) As a result of that exposure, Plaintiff had to submit herself for regular testing for AIDS and hepatitis and she was removed from working with hazardous material. (*Id.* ¶ 10.) Plaintiff later applied to be re-certified as a dangerous goods/spill clean up specialist, but her request was denied. (*Id.* ¶ 28.) The position was given to a white female with no experience in handling dangerous goods. (*Id.*) Plaintiff alleges her denial was designed to retaliate against her for exercising her federal civil rights. (*Id.* ¶ 28.)

distress, § 1981, and FMLA claims separately from her Title VII claim. (*Id.* at 10–11.)

The parties' arguments raise two issues of law. First, the court must determine whether parties may agree to a shorter limitations period than that provided by statute. Second, if the law allows such an agreement, the court must determine if the contractual limitations clause at issue here is enforceable.

### 1. Whether Parties May Agree to a Shorter Statute of Limitations for State and Federal Claims

 It is a well-settled principle that parties may agree to a limitations period shorter than that provided by state law. *See, e.g., Missouri, Kan. & Tex. Ry. Co. v. Harriman Bros.,* 227 U.S. 657, 673, 33 S.Ct. 397, 401, 57 L.Ed. 690 (1913). The general rule has been stated,

> in the absence of a controlling statute to the contrary, a provision in a contract may validly limit, between the parties, the time for bringing an action on such contract to a period less than that prescribed in the general statute of limitations, provided that the shorter period itself shall be a reasonable period.

*Order of United Commercial Travelers of Am. v. Wolfe,* 331 U.S. 586, 608, 67 S.Ct. 1355, 1365–66, 91 L.Ed. 1687 (1947). This rule reflects two axioms. First, it reflects the importance of the parties' freedom of contract absent clear policy to the contrary. *MFS Int'l, Inc. v. International Telcom Ltd.,* 50 F.Supp.2d 517, 521 (E.D.Va.1999). Second, it reflects the policy underlying statutes of limitations, namely to encourage promptness in bringing actions so as to avoid a loss of evidence from the death or disappearance of witnesses, destruction of documents, or failure of memory. *Harriman Bros.,* 227 U.S. at 672, 33 S.Ct. at 401. Thus, because statutes of limitations do not open a window to suit, but instead close a door, there is nothing in the policy or language of statutes of limitations "which inhibits parties from stipulating for a shorter period within which to assert their respective claims." *Wolfe,* 331 U.S. at 608 n. 20, 67 S.Ct. at 1365 n. 20.

The Fourth Circuit has adhered to the general principle that parties may contract for shorter limitations periods based on the same rationale, noting "it is well settled that such a provision, if reasonable in extent, is within the power of the parties and is binding upon them, even if the stipulated period is shorter than set up in the statutes of limitation[s] otherwise applicable." *Atlantic Coast Line Ry. Co. v. Pope,* 119 F.2d 39, 44 (4th Cir.1941). It has been applied within the circuit to bar various state and common law claims. *See, e.g., The Turret Crown,* 284 F. 439, 443 (4th Cir.1922) (upholding a three-month limitations clause in a carriage contract to bar a claim for breach of the contract); *Johnson v. ADT Sec. Sys., Inc.,* No. 3:96CV434–MCK, 1999 WL 1940046, *4 (W.D.N.C. March 10, 1999) (upholding a one-year limitations clause in a security services contract to bar claims for breach of contract, negligence, and intentional infliction of emotional distress); *Hilton v. Norfolk & W. Ry. Co.,* 194 F.Supp. 915, 920 (S.D.W.Va.1961) (upholding a nine-month limitations clause in a collective bargaining agreement to bar a claim for breach of the agreement).

The Supreme Court of North Carolina has honored such limitations provisions to bar state law claims in the absence of a statute explicitly disallowing them. *See, e.g., Beard v. Sovereign Lodge, W.O.W.,* 184 N.C. 154, 113 S.E. 661 (1922) (upholding a 90–day limitations clause in a fraternal benefit certificate to bar death benefit claim; noting that it has "conform[ed] its

decisions to the great weight of authority, [and] has uniformly adhered to the doctrine"). They have been upheld by North Carolina courts in a wide array of factual scenarios. *See, e.g., Town of Pineville v. Atkinson, Dyer, Watson Architects, P.A.,* 114 N.C.App. 497, 499, 442 S.E.2d 73, 74 (1994) (upholding a two-year limitations clause in a performance bond); *Horne–Wilson, Inc. v. National Sur. Co.,* 202 N.C. 73, 161 S.E. 726 (1932) (upholding a one-year limitations clause in a contractor bond); *Welch v. Phoenix Assurance Co.,* 192 N.C. 809, 136 S.E. 117 (1926) (upholding a one-year limitations clause in a fire insurance policy).

It is now clear that the general principle allowing contractual limitations, if reasonable, applies equally to federal causes of action, because there is no "principled reason" for distinguishing between state and federal statutes of limitations. *MFS Int'l,* 50 F.Supp.2d at 522. Thus, federal courts across the country, including those within the Fourth Circuit, have upheld contractual limitations to bar claims under numerous federal statutes. *See, e.g., Thurman v. DaimlerChrysler, Inc.,* 397 F.3d 352, 357–59 (6th Cir.2004) (§ 1981); *Northlake Reg'l Med. Ctr. v. Waffle House Sys. Employee Benefit Plan,* 160 F.3d 1301, 1303–04 (11th Cir.1998) (ERISA); *Taylor v. Western & S. Life Ins. Co.,* 966 F.2d 1188, 1203–06 (7th Cir.1992) (§ 1981); *Johnson v. DaimlerChrysler Corp.,* No. C.A.02–69GMS, 2003 WL 1089394, *2–3 (D.Del. March 6, 2003) (Title VII); *MFS Int'l,* 50 F.Supp.2d at 521 (Federal Communications Act); *Koonan v. Blue Cross & Blue Shield of Va.,* 802 F.Supp. 1424, 1425 (E.D.Va.1992) (ERISA).

■ Therefore, the federal law and North Carolina law allow the parties to contractually agree to shorter limitations periods than those provided by statute.

**2. Whether the Limitations Clause Contained in the Agreement is Enforceable**

■ The court must now apply the reasoned principles discussed above to determine whether the limitations clause contained in the Agreement is enforceable. First the court must decide, as to each cause of action, whether a statute prohibits the application of the limitations clause. *See Order of United Commercial Travelers of Am. v. Wolfe,* 331 U.S. 586, 608, 67 S.Ct. 1355, 1365–66, 91 L.Ed. 1687 (1947). A "controlling statute to the contrary" means a statute that explicitly proscribes a contractual limitations clause. *MFS Int'l, Inc. v. International Telcom Ltd.,* 50 F.Supp.2d 517, 522 (E.D.Va.1999). If there is such a statute, the limitations clause cannot be enforced as to that claim. If no such statute exists, however, a court must then determine whether the limitations clause at issue is reasonable under the circumstances. *See Wolfe,* 331 U.S. at 608, 67 S.Ct. at 1365–66. Both the issue of whether a limitations clause is proscribed and whether it is reasonable are matters of law. *See Leigh Ellis & Co. v. Davis,* 260 U.S. 682, 689, 43 S.Ct. 243, 244, 67 L.Ed. 460 (1923) (noting that reasonableness of a limitations clause is a matter of law).

■ Reasonableness is not subject to well-defined or commonly accepted tests or standards, but usually depends on all the facts and circumstances of a particular case. *See, e.g., Government of Indonesia v. The Gen. San Martin,* 114 F.Supp. 289, 290 (S.D.N.Y.1953); *see also,* B.H. Glenn, Annotation, *Validity of Contractual Time Period, Shorter Than Statute of Limitations, for Bringing Action,* 6 A.L.R.3d 1197 § 3 (2004). However, courts have held the reasonableness of limitations clauses depends upon whether they show imposition or undue advantage, *Capehart v. Heady,* 206 Cal.App.2d 386, 23 Cal.Rptr.

851, 852–53 (1962); the purpose of the limitations clause, *Cook v. Northern Pac. Ry. Co.*, 32 N.D. 340, 155 N.W. 867, 869 (1915); and whether they afford a plaintiff sufficient opportunity to investigate claims and prepare for the controversy, so as not to essentially abrogate the right of action, *Order of United Commercial Travelers of Am. v. Duncan*, 221 F.2d 703, 705 (6th Cir.1955).

### a. Statutory Prohibition

Applying the first prong of the *Wolfe* test to Plaintiff's emotional distress, § 1981, and FMLA claims, the court must determine whether a statute prohibits the application of the limitations clause. The court is aware of no statute which, expressly or impliedly, prohibits the application of the limitations clause to these claims.

■ Claims for emotional distress in North Carolina fall within the general three-year statute of limitations for injuries or rights not arising out of contract. *See Holloway v. Wachovia Bank & Trust Co., N.A.*, 339 N.C. 338, 351–54, 452 S.E.2d 233, 241–42 (1994). That statute contains no language disavowing contractual limitations shorter than the statutory period. *See* N.C. Gen.Stat. § 1–52(5). The court notes that at least one other court has implicitly reached a similar conclusion with regard to intentional infliction of emotional distress. *See Johnson v. ADT Sec. Sys., Inc.*, No. 3:96CV434–MCK, 1999 WL 1940046, *4 (W.D.N.C. March 10, 1999) (upholding a one-year limitations clause to bar claims for breach of contract, negligence, and intentional infliction of emotional distress).

■ The Civil Rights Act of 1866 does not contain its own statute of limitations. *Taylor v. Western & S. Life Ins. Co.*, 966 F.2d 1188, 1203 (7th Cir.1992). Plaintiff's claim under § 1981 falls within the general

four-year statute of limitations for federal causes of action which was enacted in 1990. *See James v. Circuit City Stores, Inc.*, 370 F.3d 417 (4th Cir.2004); 28 U.S.C. § 1658. Neither the Civil Rights Act of 1866 nor the applicable statute of limitations disavows or limits the effectiveness of contractual limitations clauses. Several courts have come to the same conclusion. *See Thurman v. DaimlerChrysler, Inc.*, 397 F.3d 352, 357–59 (6th Cir.2004) (upholding a six-month limitations clause in an employment contract to bar a plaintiff's § 1981 claim); *Taylor*, 966 F.2d at 1205 (same; holding that by enacting § 1981 without a statute of limitations, "Congress implied that it is willing to live with a wide range of . . . rules governing limitations of action").

■ Plaintiff's FMLA claim is controlled by an internal statute of limitations of two years for typical violations or three years for willful violations. *See* 29 U.S.C. § 2617(c)(1)-(2). Although nothing in the statute expressly prohibits the shortening of the limitations period, one court has found an implied policy against contractual limitations within the supporting federal regulations. In *Lewis v. Harper Hospital*, the district court examined the language of 29 C.F.R. § 825.220(a)(1), which prohibits employers from "interfering with, restraining, or denying the exercise of (or attempts to exercise) any rights provided by the [FMLA]." 241 F.Supp.2d 769, 772 (E.D.Mich.2002). The court also looked to 29 C.F.R. § 825.220(d), which provides that "[e]mployees cannot waive, nor may employers induce employees to waive, their rights under [the] FMLA." *Id.* After considering both sections, the court determined that imposing a six-month limitations clause "is an interference with employees' rights under the FMLA" and therefore unenforceable. *Id.* at 772–73.

The court cannot follow the logic of *Lewis*. It seems unquestionable from the underlying policy that statutes of limitations are not "rights" given to claimants and thus protected by the FMLA, but more correctly exist for the protection of defendants. *See Order of United Commercial Travelers of Am. v. Wolfe*, 331 U.S. 586, 608, 67 S.Ct. 1355, 1365–66, 91 L.Ed. 1687 (1947); *The Turret Crown*, 284 F. 439, 443 (4th Cir.1922). Therefore, this court cannot find that the FMLA regulations relied upon by the *Lewis* court can be read to imply a prohibition on contractual limitations clauses and joins at least one other court that has upheld contractual limitations of FMLA claims. *See Fink v. Guardmark, LLC*, No. CV 03–1480–BR, 2004 WL 1857114, *3–4 (D.Or. Aug.19, 2004).

The court having found no statutory prohibition to contractual limitations clauses, Plaintiff's emotional distress, § 1981, and FMLA claims will be barred as untimely if the limitations clause is reasonable.

#### b. Reasonableness of the Limitations Clause

■ Applying the second prong of the *Wolfe* test to Plaintiff's emotional distress, § 1981, and FMLA claims, the court must determine whether a North Carolina court would consider the limitations clause at issue reasonable under the circumstances.[4] The court finds it would.

■ The court finds the limitations clause to be substantively reasonable under the circumstances. While it is true that North Carolina courts have not upheld contractual limitations clauses of periods of less than one year, neither have they deemed them *per se* unreasonable. North Carolina courts have not encountered issues of enforceability regarding limitations clauses of this duration. The North Carolina legislature, however, does not oppose six-month limitations periods. North Carolina has several six-month statutes of limitations affecting claims by employees. North Carolina statutes require employees bringing employment discrimination claims under the Persons with Disabilities Protection Act to bring civil actions within 180 days. *See* N.C. Gen.Stat. § 168A–12. Employees believing they have been discriminated against because of their AIDS or HIV status are limited to a 180–day period. *See id.* § 130A–148(i). So too are employees who are wrongfully discharged for instituting a worker's compensation claim. *See id.* § 1–55. A similar period limits the time an employee can file complaints of discrimination with the North Carolina Department of Labor. *See id.* § 95–242. Plaintiff cannot claim there is a policy against limitations periods of six months when the state legislature has enacted 180–day statutes of limitations in other employment scenarios.

It is not problematic that Plaintiff's emotional distress, § 1981, and FMLA claims would have a shorter limitations period than her Title VII claim. The very nature of the law is that causes of action carry with them different limitations periods. With the widely divergent statutory limitations in North Carolina, *see, e.g.*, N.C. Gen.Stat. §§ 1–47 to –55 (ten years to six months), the court can conceive of an al-

---

4. Plaintiff claims that the contractual limitations clause is "unconscionable." (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. at 10.) The term "unconscionable" is somewhat broader in North Carolina than "reasonable," as unconscionability encompasses procedural and substantive reasonableness. *See Brenner v. Little Red School House, Ltd.*, 302 N.C. 207, 213, 274 S.E.2d 206, 210 (1981). Therefore, if a contract is reasonable, it cannot as a matter of definition be unconscionable.

most endless number of claim combinations that would bring about the same result of which Plaintiff complains. Procedural solutions were available to ease any potential burden on Plaintiff. For instance, Plaintiff could have initially filed her emotional distress, § 1981, and FMLA claims in federal court and then added her Title VII claim later. Alternatively, Plaintiff could have filed suit and asked the court for a stay pending the outcome of her EEOC charge. The possibility of an unusually long EEOC investigation or the fact that Plaintiff could not be guaranteed a stay is not sufficient to override the well-established and widely recognized rule of law allowing such contractual limitations clauses.

■ The court also finds the execution of the limitations clause to be procedurally reasonable. Plaintiff read the Employment Agreement with FedEx, including the bold warning that its contents were important. (*See* App. Supp. Def.'s Mot. Summ. J. Ex. 6; Badgett Dep. July 16, 2002, at 18–19.) Paragraph 15, containing the limitations clause, was located directly above Plaintiff's signature. Plaintiff signed the document attesting that she "underst[ood] its content." (App. Supp. Def.'s Mot. Summ. J. Ex. 6.) There is no evidence that Plaintiff questioned the limitations clause or did not understand what she was signing. She was free to reject the limitations clause and apply for employment elsewhere if she did not agree with the terms of her potential employment.

In the totality of the circumstances, the court can find nothing unreasonable in the contractual limitations clause and forecasts that North Carolina courts would come to a similar conclusion. The clause does not show imposition or create an undue advantage in favor of FedEx as it was clearly marked in the application process and was not forced upon Plaintiff at some time during her employment. The record is absent of any evidence that FedEx used the limitations clause for anything other than to protect itself against the loss of evidence based on the passage of time, the very rationale of statutes of limitations. The clause afforded Plaintiff an adequate opportunity to investigate her claims and prepare for a controversy, as she was required to investigate and file for administrative action on her Title VII claims during the same time period, with which she had no trouble. Because of the procedures available to Plaintiff to join or stay her claims, the clause did not create a de facto abrogation of her claims.

The limitations clause contained in the employment contract signed by Plaintiff and FedEx, a valid contract, does not violate North Carolina or federal law and is reasonable under the circumstances. Therefore, Plaintiff's emotional distress, § 1981, and FMLA claims are barred as untimely. Summary judgment will be entered in favor of Defendant as to these claims. As a result, it is unnecessary to determine FedEx's substantive challenges to Plaintiff's emotional distress and § 1981 claims.

### B. Plaintiff's Title VII Claim

In Count I, Plaintiff claims she was retaliated against on the basis of race and sex for availing herself of her federally protected Title VII rights. She asserts she suffered unequal terms and conditions of employment and was terminated because she filed suit in Badgett I. FedEx argues it should be granted summary judgment because Plaintiff's evidence does not rebut FedEx's legitimate, nondiscriminatory reasons for termination. (*See* Def.'s Mem. Supp. Mot. Summ. J. at 11–12.)

■ Section 704 of Title VII provides in relevant part that "[i]t shall be an unlawful employment practice for an em-

ployer to discriminate against any of [its] employees ... because [the employee] has made a charge ... under this subchapter." 42 U.S.C. § 2000e–3. An employee lack-·ing direct evidence of retaliation, such as Plaintiff, may utilize the burden shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to prove a claim of retaliation. *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir.2004). Under the *McDonnell Douglas* proof scheme, a plaintiff must first establish a prima facie case of retaliation. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 2747–48, 125 L.Ed.2d 407 (1993). After the plaintiff sets forth a prima facie case, the burden of production shifts and the employer must respond with evidence that it acted with a legitimate nondiscriminatory reason. *Id.* at 506–07, 113 S.Ct. at 2747, 113 S.Ct. 2742. If the employer makes this showing, the burden of production shifts back to the plaintiff, who must present evidence to prove that the defendant's articulated reason was only a pretext for unlawful discrimination. *Id.* at 510–11, 113 S.Ct. at 2749. Although the burden of production changes, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). The court now turns to the application of the *McDonnell Douglas* test.

■ The beginning step of the court's analysis under *McDonnell Douglas* is whether Plaintiff has established a prima facie case. To establish a prima facie case of retaliation, Plaintiff must show: (1) she engaged in an activity protected by Title VII; (2) she suffered an adverse employment action by her employer; and (3) a causal connection existed between the pro-

tected activity and the adverse action. *Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir.2004). There is no dispute that the filing of Badgett I, a lawsuit based upon unlawful employment discrimination, and the resulting trial on the merits are ·protected activity. *See, e.g., McNairn v. Sullivan*, 929 F.2d 974, 980 (4th Cir.1991). It is also not disputed that Plaintiff's termination on April 23, 2002, was an adverse employment action. *See, e.g., King v. Rumsfeld*, 328 F.3d 145, 151 (4th Cir.2003). The element at issue is the alleged causal link between Plaintiff's Title VII suit in Badgett I and her termination.

■ The Fourth Circuit has held the decisionmaker's knowledge of the protected activity and the timing of the adverse employment action are two factors helpful in determining causation. *See Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir.1989). Typically, a lengthy time lapse between the employer's awareness of the protected activity and the allegedly retaliatory termination eliminates the inference of causation. *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir.1998) (holding a three-year lapse too long to establish a causal link); *see, e.g., Causey v. Balog*, 162 F.3d 795, 803 (4th Cir.1998) (holding a 13–month lapse too long). Where the protected activity is continual in nature, courts should look to the latest protected activity when determining whether temporal proximity supports causation. *See, e.g., Brodetski v. Duffey*, 199 F.R.D. 14, 20 (D.D.C.2001) (considering a plaintiff's continuing protected activity in determining proximity).

■ Here, ·there is no doubt that both Scales and Topley knew of Plaintiff's lawsuit against FedEx at the time of her termination. As to temporal proximity, Plaintiff's termination occurred approximately two years after Plaintiff filed her

EEO complaint and 18 months after she instituted Badgett I. It is important, however, that Plaintiff was terminated one week after the conclusion of trial against her employer based upon alleged Title VII violations. Furthermore, Plaintiff's participation in the Title VII suit against FedEx was referenced in the termination letter several times. The letter stated that Plaintiff was "not too incapacitated to attend the trial last week" and alleged that "substantial evidence" of additional policy violations was uncovered during trial. (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. Ex. 5.) FedEx's knowledge and involvement in defending the Title VII suit, the short time between the end of trial in Badgett I and her termination, and the references to Plaintiff's protected activity in the termination letter are sufficient to raise an inference that FedEx took the adverse action against Plaintiff at its next available opportunity. *See Price*, 380 F.3d at 213 (finding causation in a retaliation case based upon the defendant's knowledge of the protected activity and the taking of the adverse employment action "at the first opportunity"). Therefore, Plaintiff has made out a strong prima facie case of retaliation.

■ The second step of the *McDonnell Douglas* proof scheme is whether the employer has proffered a legitimate, nondiscriminatory reason. Here, FedEx must only "introduce evidence which, *taken as true,* would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's*, 509 U.S. at 509, 113 S.Ct. at 2748. FedEx's termination letter of April 23, 2002, drafted by Topley and signed by Scales, contains such a legitimate, nondiscriminatory reason. The letter states that Plaintiff's termination is a result of her failure to return to work after 30 days of absence and to provide medical documentation supporting her

absence. (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. Ex. 5.) The letter provides these actions are a violation of FedEx's company policy, namely Policy P 1–20 and Policy P 1–8. (*Id.*) Therefore, FedEx's letter of termination provides a legitimate, nondiscriminatory reason for Plaintiff's termination which rebuts the inference of retaliation and shifts the burden of production back to Plaintiff.

The final, and most contested, step of the *McDonnell Douglas* proof scheme is whether the evidence taken in the light most favorable to Plaintiff is sufficient for a reasonable jury to determine that FedEx's articulated reason was only a pretext for unlawful discrimination. Plaintiff argues her termination was wrongful under the FMLA and that circumstances surrounding the drafting of the termination letter and questionable statements contained therein are evidence that FedEx's proffered reason is disingenuous.

■ A plaintiff can prove pretext by showing that the "explanation is 'unworthy of credence' or by offering other forms of circumstantial evidence sufficiently probative of [retaliation]." *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004) (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095). If a plaintiff's prima facie case is strong and is combined with sufficient evidence to find the employer's proffered justification false, summary judgment should be denied. *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 648 (4th Cir.2002); *E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 857 (4th Cir.2001). A mere mistake of fact by an employer which leads to a wrongful termination is not itself evidence of falsity or discriminatory motive. *Price*, 380 F.3d at 215 n. 1. Instead, the existence of mendacity is of particular weight. *St. Mary's*, 509 U.S. at 511, 113 S.Ct. at 2749. Courts have considered incorrect reasons for ter-

mination when coupled with other evidence to show the disingenuousness of the proffered reason for termination. *See Sears Roebuck & Co.*, 243 F.3d at 857 (finding a strong showing of pretext where evidence showed the proffered non-discriminatory reasons were inconsistent over time, false, and in some instances based on mistakes of fact on the employer's part).

### 1. Evidence of Wrongful Termination Under the Family and Medical Leave Act

Plaintiff first presents evidence that she was wrongfully terminated because her leave was protected under the FMLA. The FMLA entitles a qualified employee to take up to 12 work weeks of unpaid leave per year, for among other reasons, because the employee is suffering from a serious health condition. 29 U.S.C. § 2612(a)(1). To ensure employees can take full advantage of the FMLA's leave provisions, the act prohibits employers from interfering with or denying an employee's exercise of her rights under the FMLA and from discharging such an employee. *Id.* § 2615(a)(1), (2).

Employers are obligated to communicate with employees regarding their rights under the FMLA. Regulations require that each time the employee requests leave, the employer must "provide the employee with written notice detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet these obligations." 29 C.F.R. § 825.301(b)(1). The employer's written notice must be made "within a reasonable time after notice of the need for leave is given by the employee—within one or two business days if feasible." *Id.* § 925.301(c). One of the explanations necessary to the notice is "any requirements for the employee to furnish medical certification of a serious health condition and the consequences of failing to do so." *Id.* § 825.301(b)(1)(ii). Oral notice of medical certification, however, is also acceptable. Additionally, employers must "designate leave, paid or unpaid, as FMLA-qualifying, and to give notice of the designation to the employee." *Id.* § 825.208(a).

Employees also have obligations under the FMLA. During an FMLA leave period, an employee may be required to report periodically on her status and intent to return to work. *Id.* § 825.309(a). An employee may also be required to support her FMLA leave for a serious medical condition by a certification issued by a health care provider, but the employer must give individual notice of the need for certification each time it is necessary. *Id.* § 825.305(a). When an employer requests medical certification, it must also advise the employee of the potential consequences of an employee's failure to provide adequate certification. *Id.* § 825.305(d). When leave is not foreseeable, an employee must provide certification within the time frame requested by the employer, but not less than 15 days from the employer's request or within a reasonable time under the circumstances. *Id.* § 825.311(b). If an employee fails to provide a medical certification within a reasonable time, the employer may delay the employee's continuation of FMLA leave. *Id.* § 825.311(b). If the employee never produces the certification, the leave is not considered FMLA leave. *Id.* §§ 825.311(b), .312(b).

Applying the FMLA and regulations to Plaintiff's leave, the court finds that Plaintiff's absence from work was protected by the FMLA beginning April 1, 2002.[5] It is

---

5. Any time Plaintiff was absent prior to April 1, 2002, was not FMLA leave. When Plaintiff

initially requested unpaid personal leave on March 20, 2002, she did not cite medical

clear that Plaintiff made a proper request for FMLA leave as both Scales and Topley understood Plaintiff's request for "family leave" to refer to the FMLA. (Scales Dep. at 58; Topley Dep. at 31.) Furthermore, Plaintiff's request was for treatment of a serious health condition because she had a period of incapacity that required absence from work for more than three consecutive days and she received continuing treatment by a health care provider.[6] *See* 29 U.S.C. § 2611(11); 29 C.F.R. § 825.114(a)(2).

Having invoked her "family leave" for a serious medical condition, Plaintiff had to medically certify her leave within the time frame requested by FedEx, but not less than 15 days from the date of the request, or within a reasonable time under the circumstances. *See* 29 C.F.R. § 825.311(b). A reasonable jury could find that Plaintiff submitted her medical certification within a reasonable time under three theories. First, there is a genuine issue about whether FedEx received Dr. Wells' letter that Plaintiff was unable to work. (*See* Pl.'s Mem. Law Opp'n Def.'s Mot. Summ J. Ex. 10.) Both Scales and Topley admit the letter would have been some medical documentation to support her claim if it had been received. (*See* Scales Dep. at 72; Topley Dep. at 41.) Second, assuming Dr. Wells' letter was never sent to FedEx, there is a genuine issue as to whether Plaintiff was fired before the statutory minimum of 15 days had expired. It is

certain FedEx requested, at some time, that Plaintiff medically substantiate her FMLA leave, but there is a factual dispute about when the request occurred.

Third, there is a genuine issue as to whether Plaintiff returned her FMLA certification within a reasonable time under the circumstances. Plaintiff did not receive individualized notice of her FMLA rights and as a result did not appear to know that she could be fired for failing to submit the certification. (*See* App. Supp. Def.'s Mot. Summ. J. Ex. 11 ("[U]nless I do so with urgency, a letter will be placed in my file upon my return to work.").) Plaintiff spent three days in court during her FMLA leave period on Badgett I and two days under subpoena to testify in an unrelated criminal matter, both of which would have made it difficult to acquire certification during those periods. There is evidence that Dr. Wells was out of town for some period of time between Plaintiff's visit on April 12 and the receipt of the FMLA certification form on April 18. (Wells Dep. at 30.) Lastly, it took Dr. Wells seven days to return the FMLA certification form despite Plaintiff's notification that its return was urgent. (*See* App. Supp. Def.'s Mot. Summ. J. Ex. 11.) Taking all the facts and circumstances into consideration, there is a genuine issue as to whether Plaintiff returned the form within a reasonable time.

problems, but requested the leave to prepare for the upcoming trial in Badgett I. (Pls.'s Mem. Law Opp'n Def.'s Mot. Summ. J. Ex. 6.) Because her request met neither FMLA nor FedEx's Personal Leave Policy requirements, the leave request was properly denied. *See* 29 U.S.C. § 2612(a)(1). The next week Plaintiff took five days of sick leave, which was part of her earned employee benefits. (Badgett Dep. at 94.) There does not appear to be any controversy regarding the taking of the five days of sick leave.

6. Anxiety, depression, and sleeplessness have been held to be symptoms of serious medical conditions. *See Scamihorn v. General Truck Drivers*, 282 F.3d 1078 (9th Cir.2002) (depression); *Vasconcellos v. Cybex Int'l, Inc.*, 962 F.Supp. 701 (D.Md.1997) (insomnia and nervousness); *Seidle v. Provident Mut. Life Ins. Co.*, 871 F.Supp. 238 (E.D.Pa.1994) (nervous disorder).

Even if Plaintiff did not return the form within the 15–day period or a reasonable time, FedEx's remedy was not termination. The FMLA regulations provide that if an employee fails to provide a medical certification within a reasonable time, the employer may *delay* the employee's continuation of FMLA. 29 C.F.R. § 825.311(b). Only if the employee never produces the certification may the employer consider the leave not covered under the FMLA. *Id.* §§ 825.311(b), .312(b). Here, Topley believed an employee's leave to be unexcused if the employee did not provide medical documentation in a "couple of days." (Topley Dep. at 42.) As a result, FedEx did not delay the continuation of Plaintiff's FMLA when Plaintiff had not submitted her certification by April 23, 2002. Instead, FedEx treated Plaintiff's leave as not covered by the FMLA and then terminated her based upon a violation of company policy. This remedy was not available to FedEx.

Plaintiff's absence was protected by the FMLA. A genuine issue exists as to whether Plaintiff was fired before her medical documentation was required. As a result, a reasonable jury could find Plaintiff's termination was wrongful.

### 2. Evidence of the Disingenuousness of the Termination Letter

Plaintiff argues that circumstances surrounding the drafting of the termination letter and questionable statements contained therein are evidence that FedEx attempted to mask the identity of the actual decisionmaker and the real motivation behind Plaintiff's termination. Plaintiff argues despite her being an "exceptional" employee (Scales Dep. at 72) and Scales having terminated only one other employee besides Plaintiff (*id.* at 110–11), Scales lacks critical knowledge of the underlying facts to give credence to the termination letter. Scales, a black male, testified he made the decision to terminate Plaintiff, not his white managers. (*Id.* at 52, 66, 110, 122.) Scales testified that Topley merely drafted the termination letter as the two discussed Plaintiff's termination. (*Id.* at 52, 69.)

Plaintiff points out that her termination is premised upon her failure to bring in medical substantiation even though Scales admitted he had no idea whether Plaintiff actually needed to substantiate her leave. (*Id.* at 52.) In fact, Scales continued to refer Plaintiff to Tolliver when they discussed FMLA leave because Scales knew nothing about the leave policy. (Badgett Dep. at 101–02.) The termination letter also states Plaintiff had been notified in writing about the need for medical certification and had committed to bringing it in during the trial. Scales' testified he had no knowledge of whether written notification was ever given to Plaintiff, and there is some indication that Topley admitted he did not send notification. (Scales Dep. at 52.) Neither Scales nor Topley was present at trial. Furthermore, the letter states Plaintiff committed at trial to returning to work on Monday, April 22, 2002, even though the drafter, Topley, had no idea where the information came from. (Topley Dep. at 40.) The letter states there was substantial evidence of further violations of FedEx policy by Plaintiff although Scales could not identify what that further evidence was or even explain the basis for the statement in the termination letter. (Scales Dep. at 111–12.) Lastly, Scales did not know whether the decision to terminate Plaintiff was made on April 23, 2002, or was made some time before and was simply memorialized on April 23. (*Id.* at 113.)

Plaintiff presents additional evidence that, if believed, would tend to make the termination letter disingenuous. The let-

ter implies that Plaintiff had been inexcusably absent for 30 days without medical documentation. (*See* Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. Ex. 5.) Plaintiff, however, has presented evidence that she faxed Dr. Wells' letter to Scales and Tolliver on April 12, 2002, which, if true, would show the falsity of the termination letter. Additionally, Plaintiff's "unexcused" FMLA leave was much less than the 30 days alleged in the letter. The five days of leave taken prior to April 1, 2002, were sick leave provided by the company. Furthermore, Saladino's letter denying Plaintiff personal leave provides that he would direct Plaintiff's manager to give her time off necessary to attend Badgett I, which excuses three days of absence. (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. Ex. 7.) Scales was fully aware Plaintiff was under subpoena to testify as a witness in an unrelated criminal trial on April 22 and 23, 2002. (Badgett Dep. at 70; Scales Dep. at 50.) When the approved absences are considered, Plaintiff's allegedly undocumented leave accounts for approximately two weeks, much less than the 30 days alleged.

The termination letter references directly Plaintiff's protected activity: "Moreover, you were not too incapacitated to attend the trial last week which ended on Tuesday[,] April 16, 2002." (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. Ex. 5.) Considering Saladino's promise to give Plaintiff time off for the trial, this statement appears disingenuous. Additionally, the "substantial evidence" of further violations of FedEx policy allegedly arose during the Badgett I trial. The multiple references to the trial could be interpreted as linking FedEx's proffered reason for termination, undocumented leave, to its actual motivation, retaliation for Plaintiff's lawsuit.

Plaintiff's strong prima facie case when combined with her evidence tending to show both Plaintiff's termination was wrongful and Plaintiff's termination letter contained inconsistencies and was disingenuous, raises a question about FedEx's motivation for terminating Plaintiff. A reasonable jury could find FedEx was attempting to generate justification for her termination, which undermines FedEx's proffered reason. Summary judgment will be denied as to Plaintiff's retaliation claim.

## IV. CONCLUSION

For the reasons set forth herein,

IT IS ORDERED that Defendant's Motion for Summary Judgment [14] is GRANTED in part and DENIED in part. The motion is GRANTED as to Plaintiff's claims for discrimination under § 1981 (Count Two), retaliation under the FMLA (Count Three), intentional infliction of emotional distress (Count Four), and negligent infliction of emotional distress (Count Five). The motion is DENIED as to Plaintiff's claim for retaliation under Title VII (Count One).